# CIPOLLONE, INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE OF CIPOLLONE v. LIGGETT GROUP, INC., ET AL.

No. 90–1038.   Argued October 8, 1991—Reargued January 13, 1992—
Decided June 24, 1992

506

*Laurence H. Tribe* reargued the cause for petitioner. *Marc Z. Edell* argued the cause for petitioner on the original argument. With them on the briefs was *Alan M. Darnell.*

*H. Bartow Farr III* reargued the cause for respondents. With him on the briefs was *Richard G. Taranto.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Minnesota et al. by *Hubert H. Humphrey III*, Attorney General of Minnesota, and *Peter M. Ackerberg*, Special Assistant Attorney General, and by the Attorneys General for their respective States as follows: *James H. Evans* of Alabama, *Grant Woods* of Arizona, *Richard Blumenthal* of Connecticut, *Larry EchoHawk* of Idaho, *Michael E. Carpenter* of Maine, *Frankie Sue Del Papa* of Nevada, *Robert J. Del Tufo* of New Jersey, *Tom Udall* of New Mexico, *Nicholas J. Spaeth* of North Dakota, *Lee Fisher* of Ohio, and *Kenneth O. Eikenberry* of Washington; for the American Cancer Society et al. by *Alan B. Morrison, David C. Vladeck*, and *Cornish F. Hitchcock*; for the American College of Chest Physicians by *Raymond D. Cotton* and *Sherman S. Poland*; for the American Medical Association by *Kirk B. Johnson*; for the Association of Trial Lawyers of America by *Jeffrey Robert White* and *Michael C. Maher*; for the National League of Cities et al. by *Richard Ruda*; for Six Former Surgeons General of the United States et al. by *S. Stephen Rosenfeld* and *Richard A. Daynard*; and for Trial Lawyers for Public Justice, P. C., by *Charles S. Siegel* and *Arthur Bryant.*

Briefs of *amici curiae* urging affirmance were filed for the Association of National Advertisers, Inc., by *Burt Neuborne* and *Gilbert H. Weil*; for the National Association of Manufacturers by *Diane L. Zimmerman, Jan S. Amundson*, and *Quentin Riegel*; and for the Product Liability Advisory Council, Inc., by *Kenneth S. Geller* and *Mark I. Levy.*

JUSTICE STEVENS delivered the opinion of the Court, except as to Parts V and VI.

"WARNING: THE SURGEON GENERAL HAS DETERMINED THAT CIGARETTE SMOKING IS DANGEROUS TO YOUR HEALTH." A federal statute enacted in 1969 requires that warning (or a variation thereof) to appear in a conspicuous place on every package of cigarettes sold in the United States.[1] The questions presented to us by this case are whether that statute, or its 1965 predecessor which required a less alarming label, pre-empted petitioner's common-law claims against respondent cigarette manufacturers.

Petitioner is the son of Rose Cipollone, who began smoking in 1942 and who died of lung cancer in 1984. He claims that respondents are responsible for Rose Cipollone's death because they breached express warranties contained in their advertising, because they failed to warn consumers about the hazards of smoking, because they fraudulently misrepresented those hazards to consumers, and because they conspired to deprive the public of medical and scientific information about smoking. The Court of Appeals held that petitioner's state-law claims were pre-empted by federal statutes, 893 F. 2d 541 (CA3 1990), and other courts have agreed with that analysis.[2] The highest court of the State of New Jersey, however, has held that the federal statutes

---

[1] Public Health Cigarette Smoking Act of 1969, Pub. L. 91–222, 84 Stat. 87, as amended, 15 U. S. C. §§ 1331–1340. In 1984, Congress amended the statute to require four more explicit warnings, used on a rotating basis. See Comprehensive Smoking Education Act, Pub. L. 98–474, 98 Stat. 2201. Because petitioner's claims arose before 1984, neither party relies on this later Act.

[2] The Court of Appeals' analysis was initially set forth in *Cipollone* v. *Liggett Group, Inc.*, 789 F. 2d 181 (CA3 1986). Other federal courts have adopted a similar analysis. See *Pennington* v. *Vistron Corp.*, 876 F. 2d 414 (CA5 1989); *Roysdon* v. *R. J. Reynolds Tobacco Co.*, 849 F. 2d 230 (CA6 1988); *Stephen* v. *American Brands, Inc.*, 825 F. 2d 312 (CA11 1987); *Palmer* v. *Liggett Group, Inc.*, 825 F. 2d 620 (CA1 1987).

did not pre-empt similar common-law claims.[3]  Because of the manifest importance of the issue, we granted certiorari to resolve the conflict, 499 U. S. 935 (1991).  We now reverse in part and affirm in part.

## I

On August 1, 1983, Rose Cipollone and her husband filed a complaint invoking the diversity jurisdiction of the Federal District Court.  Their complaint alleged that Rose Cipollone developed lung cancer because she smoked cigarettes manufactured and sold by the three respondents.  After her death in 1984, her husband filed an amended complaint.  After trial, he also died; their son, executor of both estates, now maintains this action.

Petitioner's third amended complaint alleges several different bases of recovery, relying on theories of strict liability, negligence, express warranty, and intentional tort.  These claims, all based on New Jersey law, divide into five categories.  The "design defect claims" allege that respondents' cigarettes were defective because respondents failed to use a safer alternative design for their products and because the social value of their product was outweighed by the dangers it created (Count 2, App. 83–84).  The "failure to warn claims" allege both that the product was "defective as a result of [respondents'] failure to provide adequate warnings of the health consequences of cigarette smoking" (Count 3, App. 85) and that respondents "were negligent in the manner [that] they tested, researched, sold, promoted and advertised" their cigarettes (Count 4, App. 86).  The "express warranty claims" allege that respondents had "expressly

---

[3] *Dewey* v. *R. J. Reynolds Tobacco Co.*, 121 N. J. 69, 577 A. 2d 1239 (1990) (holding that the Cigarette Act does not pre-empt plaintiff's failure-to-warn and misrepresentation claims); see also *Forster* v. *R. J. Reynolds Tobacco Co.*, 437 N. W. 2d 655 (Minn. 1989) (holding that plaintiffs' claim in strict liability for unsafe design was not pre-empted; claims for misrepresentation and breach of express warranty would also not be pre-empted).

warranted that smoking the cigarettes which they manufactured and sold did not present any significant health consequences" (Count 7, App. 88). The "fraudulent misrepresentation claims" allege that respondents had willfully, "through their advertising, attempted to neutralize the [federally mandated] warnin[g]" labels (Count 6, App. 87–88), and that they had possessed, but had "ignored and failed to act upon," medical and scientific data indicating that "cigarettes were hazardous to the health of consumers" (Count 8, App. 89). Finally, the "conspiracy to defraud claims" allege that respondents conspired to deprive the public of such medical and scientific data *(ibid.)*.

As one of their defenses, respondents contended that the Federal Cigarette Labeling and Advertising Act, enacted in 1965, and its successor, the Public Health Cigarette Smoking Act of 1969, protected them from any liability based on their conduct after 1965. In a pretrial ruling, the District Court concluded that the federal statutes were intended to establish a uniform warning that would prevail throughout the country and that would protect cigarette manufacturers from being "subjected to varying requirements from state to state," *Cipollone* v. *Liggett Group, Inc.*, 593 F. Supp. 1146, 1148 (NJ 1984), but that the statutes did not pre-empt common-law actions. *Id.*, at 1153–1170.[4] Accordingly, the court granted a motion to strike the pre-emption defense entirely.

---

[4] The court explained:

"However, the existence of the present federally mandated warning does not prevent an individual from claiming that the risks of smoking are greater than the warning indicates, and that therefore such warning is inadequate. The court recognizes that it will be extremely difficult for a plaintiff to prove that the present warning is inadequate to inform of the dangers, whatever they may be. However, the difficulty of proof cannot preclude the opportunity to be heard, and affording that opportunity will not undermine the purposes of the Act." 593 F. Supp., at 1148.

The Court of Appeals accepted an interlocutory appeal pursuant to 28 U. S. C. § 1292(b), and reversed. *Cipollone* v. *Liggett Group, Inc.*, 789 F. 2d 181 (CA3 1986). The court rejected respondents' contention that the federal Acts expressly pre-empted common-law actions, but accepted their contention that such actions would conflict with federal law. Relying on the statement of purpose in the statutes,[5] the court concluded that Congress' "carefully drawn balance between the purposes of warning the public of the hazards of cigarette smoking and protecting the interests of national economy" would be upset by state-law damages actions based on noncompliance with "warning, advertisement, and promotion obligations other than those prescribed in the [federal] Act." *Id.*, at 187. Accordingly, the court held:

> "[T]he Act preempts those state law damage[s] actions relating to smoking and health that challenge either the adequacy of the warning on cigarette packages or the propriety of a party's actions with respect to the advertising and promotion of cigarettes. [W]here the success of a state law damage[s] claim necessarily depends on the assertion that a party bore the duty to provide a warning to consumers in addition to the warning Congress has required on cigarette packages, such claims are preempted as conflicting with the Act." *Ibid.* (footnote omitted).

---

[5] "It is the policy of the Congress, and the purpose of this chapter, to establish a comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby—

"(1) the public may be adequately informed that cigarette smoking may be hazardous to health by inclusion of a warning to that effect on each package of cigarettes; and

"(2) commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health." 15 U. S. C. § 1331 (1982 ed.).

The court did not, however, identify the specific claims asserted by petitioner that were pre-empted by the Act.

This Court denied a petition for certiorari, 479 U.S. 1043 (1987), and the case returned to the District Court for trial. Complying with the Court of Appeals' mandate, the District Court held that the failure-to-warn, express-warranty, fraudulent-misrepresentation, and conspiracy-to-defraud claims were barred to the extent that they relied on respondents' advertising, promotional, and public relations activities after January 1, 1966 (the effective date of the 1965 Act). 649 F. Supp. 664, 669, 673–675 (NJ 1986). The court also ruled that while the design defect claims were not pre-empted by federal law, those claims were barred on other grounds.[6] *Id.*, at 669–672. Following extensive discovery and a 4-month trial, the jury answered a series of special interrogatories and awarded $400,000 in damages to Rose Cipollone's husband. In brief, it rejected all of the fraudulent-misrepresentation and conspiracy claims, but found that respondent Liggett had breached its duty to warn and its express warranties before 1966. It found, however, that Rose Cipollone had "'voluntarily and unreasonably encounter[ed] a known danger by smoking cigarettes'" and that 80% of the responsibility for her injuries was attributable to her. See 893 F. 2d, at 554 (summarizing jury findings). For that reason, no damages were awarded to her estate. However, the jury awarded damages to compensate her husband for losses caused by respondents' breach of express warranty.

On cross-appeals from the final judgment, the Court of Appeals affirmed the District Court's pre-emption rulings but remanded for a new trial on several issues not relevant to our decision. We granted the petition for certiorari to consider the pre-emptive effect of the federal statutes.

---

[6] We are not presented with any question concerning these claims.

## II

Although physicians had suspected a link between smoking and illness for centuries, the first medical studies of that connection did not appear until the 1920's. See U. S. Dept. of Health and Human Services, Report of the Surgeon General, Reducing the Health Consequences of Smoking: 25 Years of Progress 5 (1989). The ensuing decades saw a wide range of epidemiologic and laboratory studies on the health hazards of smoking. Thus, by the time the Surgeon General convened an advisory committee to examine the issue in 1962, there were more than 7,000 publications examining the relationship between smoking and health. *Id.*, at 5–7.

In 1964, the advisory committee issued its report, which stated as its central conclusion: "Cigarette smoking is a health hazard of sufficient importance in the United States to warrant appropriate remedial action." U. S. Dept. of Health, Education, and Welfare, U. S. Surgeon General's Advisory Committee, Smoking and Health 33 (1964). Relying in part on that report, the Federal Trade Commission (FTC), which had long regulated unfair and deceptive advertising practices in the cigarette industry,[7] promulgated a new trade regulation rule. That rule, which was to take effect January 1, 1965, established that it would be a violation of the Federal Trade Commission Act "to fail to disclose, clearly and prominently, in all advertising and on every pack, box, carton, or container [of cigarettes] that cigarette smoking is dangerous to health and may cause death from cancer and other diseases." 29 Fed. Reg. 8325 (1964). Several States also moved to regulate the advertising and labeling of cigarettes. See, *e. g.*, 1965 N. Y. Laws, ch. 470; see also 111 Cong. Rec. 13900–13902 (1965) (statement of Sen. Moss). Upon a congressional request, the FTC postponed enforcement of its

---

[7] See, *e. g.*, *Brown & Williamson Tobacco Corp.*, 56 F. T. C. 956 (1960); *Liggett & Myers Tobacco Co.*, 55 F. T. C. 354 (1958); *Philip Morris & Co., Ltd.*, 51 F. T. C. 857 (1955); *R. J. Reynolds Tobacco Co.*, 48 F. T. C. 682 (1952); *London Tobacco Co.*, 36 F. T. C. 282 (1943).

new regulation for six months. In July 1965, Congress enacted the Federal Cigarette Labeling and Advertising Act (1965 Act or Act).[8] The 1965 Act effectively adopted half of the FTC's regulation: the Act mandated warnings on cigarette packages (§ 5(a)), but barred the requirement of such warnings in cigarette advertising (§ 5(b)).[9]

Section 2 of the Act declares the statute's two purposes: (1) adequately informing the public that cigarette smoking may be hazardous to health, and (2) protecting the national economy from the burden imposed by diverse, nonuniform, and confusing cigarette labeling and advertising regulations.[10] In furtherance of the first purpose, § 4 of the Act made it unlawful to sell or distribute any cigarettes in the United States unless the package bore a conspicuous label stating: "CAUTION: CIGARETTE SMOKING MAY BE HAZARDOUS TO YOUR HEALTH." In furtherance of the second purpose, § 5, captioned "Preemption," provided in part:

> "(a) No statement relating to smoking and health, other than the statement required by section 4 of this Act, shall be required on any cigarette package.
>
> "(b) No statement relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act."

Although the Act took effect January 1, 1966, § 10 of the Act provided that its provisions affecting the regulation of advertising would terminate on July 1, 1969.

As that termination date approached, federal authorities prepared to issue further regulations on cigarette advertising. The FTC announced the reinstitution of its 1964 pro-

---

[8] Pub. L. 89–92, 79 Stat. 282, as amended, 15 U. S. C. §§ 1331–1340.

[9] However, § 5(c) of the Act expressly preserved "the authority of the Federal Trade Commission with respect to unfair or deceptive acts or practices in the advertising of cigarettes." 79 Stat. 283.

[10] See n. 5, *supra.*

ceedings concerning a warning requirement for cigarette advertisements. 34 Fed. Reg. 7917 (1969). The Federal Communications Commission (FCC) announced that it would consider "a proposed rule which would ban the broadcast of cigarette commercials by radio and television stations." *Id.*, at 1959. State authorities also prepared to take actions regulating cigarette advertisements.[11]

It was in this context that Congress enacted the Public Health Cigarette Smoking Act of 1969 (1969 Act or Act),[12] which amended the 1965 Act in several ways. First, the 1969 Act strengthened the warning label, in part by requiring a statement that cigarette smoking "is dangerous" rather than that it "may be hazardous." Second, the 1969 Act banned cigarette advertising in "any medium of electronic communication subject to [FCC] jurisdiction." Third, and related, the 1969 Act modified the pre-emption provision by replacing the original § 5(b) with a provision that reads:

> "(b) No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act."

Although the Act also directed the FTC not to "take any action before July 1, 1971, with respect to its pending trade regulation rule proceeding relating to cigarette advertising," the narrowing of the pre-emption provision to prohibit only restrictions "imposed under State law" cleared the way for the FTC to extend the warning-label requirement to print advertisements for cigarettes. The FTC did so in 1972. See *In re Lorillard*, 80 F. T. C. 455 (1972).

---

[11] For example, the California State Senate passed a total ban on both print and electronic cigarette advertisements. "California Senate Votes Ban On Cigarette Advertising," Washington Post, June 26, 1969, p. A9.

[12] Pub. L. 91–222, 84 Stat. 87, as amended, 15 U. S. C. §§ 1331–1340.

## III

Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2. Thus, since our decision in *McCulloch* v. *Maryland,* 4 Wheat. 316, 427 (1819), it has been settled that state law that conflicts with federal law is "without effect." *Maryland* v. *Louisiana,* 451 U. S. 725, 746 (1981). Consideration of issues arising under the Supremacy Clause "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress." *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 230 (1947). Accordingly, "'[t]he purpose of Congress is the ultimate touchstone'" of pre-emption analysis. *Malone* v. *White Motor Corp.,* 435 U. S. 497, 504 (1978) (quoting *Retail Clerks* v. *Schermerhorn,* 375 U. S. 96, 103 (1963)).

Congress' intent may be "explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones* v. *Rath Packing Co.,* 430 U. S. 519, 525 (1977). In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law, see *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation and Development Comm'n,* 461 U. S. 190, 204 (1983), or if federal law so thoroughly occupies a legislative field "'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Fidelity Fed. Sav. & Loan Assn.* v. *De la Cuesta,* 458 U. S. 141, 153 (1982) (quoting *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S., at 230).

The Court of Appeals was not persuaded that the preemption provision in the 1969 Act encompassed state common-law claims.[13] 789 F. 2d, at 185–186. It was also

---

[13] In its express pre-emption analysis, the court did not distinguish between the pre-emption provisions of the 1965 and 1969 Acts; it relied solely on the latter, apparently believing that the 1969 provision was at least as

not persuaded that the labeling obligation imposed by both the 1965 and 1969 Acts revealed a congressional intent to exert exclusive federal control over every aspect of the relationship between cigarettes and health. *Id.*, at 186. Nevertheless, reading the statute as a whole in the light of the statement of purpose in § 2, and considering the potential regulatory effect of state common-law actions on the federal interest in uniformity, the Court of Appeals concluded that Congress had impliedly pre-empted petitioner's claims challenging the adequacy of the warnings on labels or in advertising or the propriety of respondents' advertising and promotional activities. *Id.*, at 187.

In our opinion, the pre-emptive scope of the 1965 Act and the 1969 Act is governed entirely by the express language in § 5 of each Act. When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a "reliable indicium of congressional intent with respect to state authority," *Malone* v. *White Motor Corp.*, 435 U. S., at 505, "there is no need to infer congressional intent to pre-empt state laws from the substantive provisions" of the legislation. *California Federal Savings & Loan Assn.* v. *Guerra*, 479 U. S. 272, 282 (1987) (opinion of Marshall, J.). Such reasoning is a variant of the familiar principle of *expressio unius est exclusio alterius:* Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted. In this case, the other provisions of the 1965 and 1969 Acts offer no cause to look beyond § 5 of each Act. Therefore, we need only identify the domain expressly pre-empted by each of those sections. As the 1965 and 1969 provisions differ substantially, we consider each in turn.

broad as the 1965 provision. The court's ultimate ruling that petitioner's claims were impliedly pre-empted effective January 1, 1966, reflects the fact that the 1969 Act did not alter the statement of purpose in § 2, which was critical to the court's implied pre-emption analysis.

## IV

In the 1965 pre-emption provision regarding advertising (§ 5(b)), Congress spoke precisely and narrowly: "No *statement* relating to smoking and health shall be required *in the advertising* of [properly labeled] cigarettes." Section 5(a) used the same phrase ("No *statement* relating to smoking and health") with regard to cigarette labeling. As § 5(a) made clear, that phrase referred to the sort of warning provided for in § 4, which set forth verbatim the warning Congress determined to be appropriate. Thus, on their face, these provisions merely prohibited state and federal rulemaking bodies from mandating particular cautionary statements on cigarette labels (§ 5(a)) or in cigarette advertisements (§ 5(b)).

Beyond the precise words of these provisions, this reading is appropriate for several reasons. First, as discussed above, we must construe these provisions in light of the presumption against the pre-emption of state police power regulations. This presumption reinforces the appropriateness of a narrow reading of § 5. Second, the warning required in § 4 does not by its own effect foreclose additional obligations imposed under state law. That Congress requires a particular warning label does not automatically pre-empt a regulatory field. See *McDermott* v. *Wisconsin*, 228 U. S. 115, 131–132 (1913). Third, there is no general, inherent conflict between federal pre-emption of state warning requirements and the continued vitality of state common-law damages actions. For example, in the Comprehensive Smokeless Tobacco Health Education Act of 1986,[14] Congress expressly pre-empted state or local imposition of a "statement relating to the use of smokeless tobacco products and health" but, at the same time, preserved state-law damages actions based on those products. See 15 U. S. C. § 4406. All of these considerations indicate that § 5 is best read as having super-

---

[14] Pub. L. 99–252, 100 Stat. 30, as codified, 15 U. S. C. §§ 4401–4408.

seded only positive enactments by legislatures or administrative agencies that mandate particular warning labels.[15]

This reading comports with the 1965 Act's statement of purpose, which expressed an intent to avoid "diverse, non-uniform, and confusing cigarette labeling and advertising *regulations* with respect to any relationship between smoking and health." Read against the backdrop of regulatory activity undertaken by state legislatures and federal agencies in response to the Surgeon General's report, the term "regulation" most naturally refers to positive enactments by those bodies, not to common-law damages actions.

The regulatory context of the 1965 Act also supports such a reading. As noted above, a warning requirement promulgated by the FTC and other requirements under consideration by the States were the catalyst for passage of the 1965 Act. These regulatory actions animated the passage of § 5, which reflected Congress' efforts to prevent "a multiplicity of State and local regulations pertaining to labeling of cigarette packages," H. R. Rep. No. 449, 89th Cong., 1st Sess., 4 (1965), and to "preemp[t] all Federal, State, and local authorities from requiring *any statement* relating to smoking and health in the advertising of cigarettes." *Id.*, at 5 (emphasis supplied).[16]

For these reasons, we conclude that § 5 of the 1965 Act only pre-empted state and federal rulemaking bodies from

---

[15] Cf. *Banzhaf* v. *FCC*, 132 U. S. App. D. C. 14, 405 F. 2d 1082 (1968) (holding that 1965 Act did not pre-empt FCC's fairness policy as applied to cigarette advertising), cert. denied, 396 U. S. 842 (1969).

[16] JUSTICE SCALIA takes issue with our narrow reading of the phrase "No statement." His criticism, however, relies solely on an interpretation of those two words, artificially severed from both textual and legislative context. As demonstrated above, the phrase "No statement" in § 5(b) refers to the similar phrase in § 5(a), which refers in turn to § 4, which itself sets forth a *particular* statement. This context, combined with the regulatory setting in which Congress acted, establishes that a narrow reading of the phrase "No statement" is appropriate.

mandating particular cautionary statements and did not pre-empt state-law damages actions.[17]

## V

Compared to its predecessor in the 1965 Act, the plain language of the pre-emption provision in the 1969 Act is much broader. First, the later Act bars not simply "statement[s]" but rather "requirement[s] or prohibition[s] . . . imposed under State law." Second, the later Act reaches beyond statements "in the advertising" to obligations "with respect to the advertising or promotion" of cigarettes.

Notwithstanding these substantial differences in language, both petitioner and respondents contend that the 1969 Act did not materially alter the pre-emptive scope of federal law.[18] Their primary support for this contention is a sentence in a Committee Report which states that the 1969 amendment "clarified" the 1965 version of § 5(b). S. Rep. No. 91–566, p. 12 (1969). We reject the parties' reading as incompatible with the language and origins of the amendments. As we noted in another context, "[i]nferences from legislative history cannot rest on so slender a reed. Moreover, the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States* v. *Price*, 361 U. S. 304, 313 (1960). The 1969 Act worked substantial changes in the law: rewriting the label warning, banning broadcast advertising, and allowing the FTC to regulate print advertising. In the context of such revisions and in light of the substantial changes in wording,

---

[17] This interpretation of the 1965 Act appears to be consistent with respondents' contemporaneous understanding of the Act. Although respondents have participated in a great deal of litigation relating to cigarette use beginning in the 1950's, it appears that this case is the first in which they have raised § 5 as a pre-emption defense.

[18] See Brief for Petitioner 23–24; Brief for Respondents 21–23.

we cannot accept the parties' claim that the 1969 Act did not alter the reach of §5(b).[19]

Petitioner next contends that §5(b), however broadened by the 1969 Act, does not pre-empt *common-law* actions. He offers two theories for limiting the reach of the amended §5(b). First, he argues that common-law damages actions do not impose "requirement[s] or prohibition[s]" and that Congress intended only to trump "state statute[s], injunction[s], or executive pronouncement[s]."[20] We disagree; such an analysis is at odds both with the plain words of the 1969 Act and with the general understanding of common-law damages actions. The phrase "[n]o requirement or prohibition" sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common-law rules. As we noted in another context, "[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 247 (1959).

Although portions of the legislative history of the 1969 Act suggest that Congress was primarily concerned with positive enactments by States and localities, see S. Rep. No. 91–566, p. 12, the language of the Act plainly reaches beyond such enactments. "We must give effect to this plain language unless there is good reason to believe Congress intended the language to have some more restrictive meaning." *Shaw* v.

---

[19] As noted above, the 1965 Act's statement of purpose (§2) suggested that Congress was concerned primarily with "regulations"—positive enactments, rather than common-law damages actions. Although the 1969 Act did not amend §2, we are not persuaded that the retention of that portion of the 1965 Act is a sufficient basis for rejecting the plain meaning of the broad language that Congress added to §5(b).

[20] Brief for Petitioner 20.

*Delta Air Lines, Inc.*, 463 U. S. 85, 97 (1983). In this case there is no "good reason to believe" that Congress meant less than what it said; indeed, in light of the narrowness of the 1965 Act, there is "good reason to believe" that Congress meant precisely what it said in amending that Act.

Moreover, common-law damages actions of the sort raised by petitioner are premised on the existence of a legal duty, and it is difficult to say that such actions do not impose "requirements or prohibitions." See W. Prosser, Law of Torts 4 (4th ed. 1971); Black's Law Dictionary 1489 (6th ed. 1990) (defining "tort" as "always [involving] a violation of some duty owing to plaintiff"). It is in this way that the 1969 version of § 5(b) differs from its predecessor: Whereas the common law would not normally require a vendor to use any specific *statement* on its packages or in its advertisements, it is the essence of the common law to enforce duties that are either affirmative *requirements* or negative *prohibitions*. We therefore reject petitioner's argument that the phrase "requirement or prohibition" limits the 1969 Act's preemptive scope to positive enactments by legislatures and agencies.

Petitioner's second argument for excluding common-law rules from the reach of § 5(b) hinges on the phrase "imposed under State law." This argument fails as well. At least since *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938), we have recognized the phrase "state law" to include common law as well as statutes and regulations. Indeed just last Term, the Court stated that the phrase " 'all other law, including State and municipal law' " "does not admit of [a] distinction . . . between positive enactments and common-law rules of liability." *Norfolk & Western R. Co.* v. *Train Dispatchers*, 499 U. S. 117, 128 (1991). Although the presumption against pre-emption might give good reason to construe the phrase "state law" in a pre-emption provision more narrowly than an identical phrase in another context, in this case such a construction is not appropriate. As explained above, the

1965 version of §5 was precise and narrow on its face; the obviously broader language of the 1969 version extended that section's pre-emptive reach. Moreover, while the version of the 1969 Act passed by the Senate pre-empted "any State *statute or regulation* with respect to . . . advertising or promotion," S. Rep. No. 91–566, p. 16 (1969), the Conference Committee replaced this language with "State *law* with respect to advertising or promotion." In such a situation, §5(b)'s pre-emption of "state law" cannot fairly be limited to positive enactments.

That the pre-emptive scope of §5(b) cannot be limited to positive enactments does not mean that that section pre-empts all common-law claims. For example, as respondents concede, §5(b) does not generally pre-empt "state-law obligations to avoid marketing cigarettes with manufacturing defects or to use a demonstrably safer alternative design for cigarettes."[21] For purposes of §5(b), the common law is not of a piece.

Nor does the statute indicate that any familiar subdivision of common-law claims is or is not pre-empted. We therefore cannot follow petitioner's passing suggestion that §5(b) pre-empts liability for omissions but not for acts, or that §5(b) pre-empts liability for unintentional torts but not for intentional torts. Instead we must fairly but—in light of the strong presumption against pre-emption—narrowly construe the precise language of §5(b) and we must look to each of petitioner's common-law claims to determine whether it is in fact pre-empted.[22] The central inquiry in each case is

---

[21] Brief for Respondents 14.

[22] Petitioner makes much of the fact that Congress did not expressly include common law within §5's pre-emptive reach, as it has in other statutes. See, *e. g.,* 29 U. S. C. §1144(c)(1); 12 U. S. C. §1715z–17(d). Respondents make much of the fact that Congress did not include a saving clause preserving common-law claims, again, as it has in other statutes. See, *e. g.,* 17 U. S. C. §301. Under our analysis of §5, these omissions make perfect sense: Congress was neither pre-empting nor saving common law

straightforward: we ask whether the legal duty that is the predicate of the common-law damages action constitutes a "requirement or prohibition based on smoking and health . . . imposed under State law with respect to . . . advertising or promotion," giving that clause a fair but narrow reading. As discussed below, each phrase within that clause limits the universe of common-law claims pre-empted by the statute.

We consider each category of damages actions in turn. In doing so, we express no opinion on whether these actions are viable claims as a matter of state law; we assume, *arguendo*, that they are.

### Failure to Warn

To establish liability for a failure to warn, petitioner must show that "a warning is necessary to make a product . . . reasonably safe, suitable and fit for its intended use," that respondents failed to provide such a warning, and that that failure was a proximate cause of petitioner's injury. Tr. 12738. In this case, petitioner offered two closely related theories concerning the failure to warn: first, that respondents "were negligent in the manner [that] they tested, researched, sold, promoted, and advertised" their cigarettes; and second, that respondents failed to provide "adequate warnings of the health consequences of cigarette smoking." App. 85–86.

Petitioner's claims are pre-empted to the extent that they rely on a state-law "requirement or prohibition . . . with respect to . . . advertising or promotion." Thus, insofar as claims under either failure-to-warn theory require a showing that respondents' post-1969 advertising or promotions should have included additional, or more clearly stated, warnings, those claims are pre-empted. The Act does not, however, pre-empt petitioner's claims that rely solely on respondents'

---

as a whole—it was simply pre-empting particular common-law claims, while saving others.

testing or research practices or other actions unrelated to advertising or promotion.

*Breach of Express Warranty*

Petitioner's claim for breach of an express warranty arises under N. J. Stat. Ann. § 12A:2–313(1)(a) (West 1962), which provides:

> "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

Petitioner's evidence of an express warranty consists largely of statements made in respondents' advertising. See 893 F. 2d, at 574, 576; 683 F. Supp. 1487, 1497 (NJ 1988). Applying the Court of Appeals' ruling that Congress pre-empted "damage[s] actions . . . that challenge . . . the propriety of a party's actions with respect to the advertising and promotion of cigarettes," 789 F. 2d, at 187, the District Court ruled that this claim "inevitably brings into question [respondents'] advertising and promotional activities, and is therefore pre-empted" after 1965. 649 F. Supp., at 675. As demonstrated above, however, the 1969 Act does not sweep so broadly: The appropriate inquiry is not whether a claim challenges the "propriety" of advertising and promotion, but whether the claim would require the imposition under state law of a requirement or prohibition based on smoking and health with respect to advertising or promotion.

A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty. Accordingly, the "requirement[s]" imposed by an express warranty claim are not "imposed under State law," but rather imposed *by the warrantor*.[23] If, for example, a

---

[23] Thus it is that express warranty claims are said to sound in contract rather than in tort. Compare Black's Law Dictionary 1489 (6th ed. 1990) (defining "tort": "There must always be a violation of some duty . . . and

manufacturer expressly promised to pay a smoker's medical bills if she contracted emphysema, the duty to honor that promise could not fairly be said to be "imposed under state law," but rather is best understood as undertaken by the manufacturer itself. While the general duty not to breach warranties arises under state law, the particular "requirement . . . based on smoking and health . . . with respect to the advertising or promotion [of] cigarettes" in an express warranty claim arises from the manufacturer's statements in its advertisements. In short, a common-law remedy for a contractual commitment voluntarily undertaken should not be regarded as a "requirement . . . *imposed under State law*" within the meaning of § 5(b).[24]

That the terms of the warranty may have been set forth in advertisements rather than in separate documents is irrelevant to the pre-emption issue (though possibly not to the state-law issue of whether the alleged warranty is valid and enforceable) because, although the breach of warranty claim is made "with respect to . . . advertising," it does not rest on a duty imposed under state law. Accordingly, to the extent that petitioner has a viable claim for breach of express war-

---

generally such duty must arise by operation of law and not by mere agreement of the parties") with *id.*, at 322 (defining "contract": "An agreement between two . . . persons which creates an obligation").

[24] JUSTICE SCALIA contends that because the general duty to honor express warranties arises under state law, every express warranty obligation is a "requirement . . . imposed under State law," and that, therefore, the Act pre-empts petitioner's express warranty claim. JUSTICE SCALIA might be correct if the Act pre-empted "*liability*" imposed under state law (as he suggests, *post*, at 551); but instead the Act expressly pre-empts only a "*requirement or prohibition*" imposed under state law. That a "contract has no legal force apart from the [state] law that acknowledges its binding character," *Norfolk & Western R. Co.* v. *Train Dispatchers*, 499 U. S. 117, 130 (1991), does not mean that every contractual provision is "imposed under State law." To the contrary, common understanding dictates that a contractual requirement, although only enforceable under state law, is not "imposed" by the State, but rather is "imposed" by the contracting party upon itself.

ranties made by respondents, that claim is not pre-empted by the 1969 Act.

*Fraudulent Misrepresentation*

Petitioner alleges two theories of fraudulent misrepresentation. First, petitioner alleges that respondents, through their advertising, neutralized the effect of federally mandated warning labels. Such a claim is predicated on a state-law prohibition against statements in advertising and promotional materials that tend to minimize the health hazards associated with smoking. Such a *prohibition*, however, is merely the converse of a state-law *requirement* that warnings be included in advertising and promotional materials. Section 5(b) of the 1969 Act pre-empts both requirements and prohibitions; it therefore supersedes petitioner's first fraudulent-misrepresentation theory.

Regulators have long recognized the relationship between prohibitions on advertising that downplays the dangers of smoking and requirements for warnings in advertisements. For example, the FTC, in promulgating its initial trade regulation rule in 1964, criticized advertising that "associated cigarette smoking with such positive attributes as contentment, glamour, romance, youth, happiness . . . at the same time suggesting that smoking is an activity at least consistent with physical health and well-being." The Commission concluded:

> "To avoid giving a false impression that smoking [is] innocuous, the cigarette manufacturer who represents the alleged pleasures or satisfactions of cigarette smoking in his advertising must also disclose the serious risks to life that smoking involves." 29 Fed. Reg. 8356 (1964).

Longstanding regulations of the Food and Drug Administration express a similar understanding of the relationship between required warnings and advertising that "negates or disclaims" those warnings: "A hazardous substance shall not be deemed to have met [federal labeling] requirements if

there appears in or on the label . . . statements, designs, or other graphic material that in any manner negates or disclaims [the required warning]." 21 CFR § 191.102 (1965). In this light it seems quite clear that petitioner's first theory of fraudulent misrepresentation is inextricably related to petitioner's first failure-to-warn theory, a theory that we have already concluded is largely pre-empted by § 5(b).

Petitioner's second theory, as construed by the District Court, alleges intentional fraud and misrepresentation both by "false representation of a material fact [and by] conceal[-ment of] a material fact." Tr. 12727.[25] The predicate of this claim is a state-law duty not to make false statements of material fact or to conceal such facts. Our pre-emption analysis requires us to determine whether such a duty is the sort of requirement or prohibition proscribed by § 5(b).

Section 5(b) pre-empts only the imposition of state-law obligations "with respect to the advertising or promotion" of cigarettes. Petitioner's claims that respondents concealed material facts are therefore not pre-empted insofar as those claims rely on a state-law duty to disclose such facts through channels of communication other than advertising or promotion. Thus, for example, if state law obliged respondents to disclose material facts about smoking and health to an administrative agency, § 5(b) would not pre-empt a state-law claim based on a failure to fulfill that obligation.

Moreover, petitioner's fraudulent-misrepresentation claims that do arise with respect to advertising and promotions (most notably claims based on allegedly false statements of material fact made in advertisements) are not pre-empted by § 5(b). Such claims are predicated not on a duty "based on smoking and health" but rather on a more general obliga-

_____

[25] The District Court stated that this claim "consists of the following elements: 1) a material misrepresentation of . . . fact [by false statement or concealment]; 2) knowledge of the falsity . . . ; 3) intent that the misrepresentation be relied upon; 4) justifiable reliance . . . ; 5) resultant damage." 683 F. Supp. 1487, 1499 (NJ 1988).

tion—the duty not to deceive. This understanding of fraud by intentional misstatement is appropriate for several reasons. First, in the 1969 Act, Congress offered no sign that it wished to insulate cigarette manufacturers from longstanding rules governing fraud. To the contrary, both the 1965 and the 1969 Acts explicitly reserved the FTC's authority to identify and punish deceptive advertising practices— an authority that the FTC had long exercised and continues to exercise. See §5(c) of the 1965 Act; §7(b) of the 1969 Act; see also nn. 7, 9, *supra*. This indicates that Congress intended the phrase "relating to smoking and health" (which was essentially unchanged by the 1969 Act) to be construed narrowly, so as not to proscribe the regulation of deceptive advertising.[26]

Moreover, this reading of "based on smoking and health" is wholly consistent with the purposes of the 1969 Act. State-law prohibitions on false statements of material fact do not create "diverse, nonuniform, and confusing" standards. Unlike state-law obligations concerning the warning necessary to render a product "reasonably safe," state-law proscriptions on intentional fraud rely only on a single, uniform standard: falsity. Thus, we conclude that the phrase "based on smoking and health" fairly but narrowly construed does not encompass the more general duty not to make fraudulent statements. Accordingly, petitioner's claim based on allegedly fraudulent statements made in respondents' advertisements is not pre-empted by §5(b) of the 1969 Act.[27]

---

[26] The Senate Report emphasized that the "preemption of regulation or prohibition with respect to cigarette advertising is *narrowly phrased to preempt only State action based on smoking and health*. It would in no way affect the power of any State . . . with respect to the taxation or the sale of cigarettes to minors, or the prohibition of smoking in public buildings, or *similar police regulations*." S. Rep. No. 91–566, p. 12 (1969) (emphasis supplied).

[27] Both JUSTICE BLACKMUN and JUSTICE SCALIA challenge the level of generality employed in our analysis. JUSTICE BLACKMUN contends that, as a matter of consistency, we should construe failure-to-warn claims *not*

*Conspiracy to Misrepresent or Conceal Material Facts*

Petitioner's final claim alleges a conspiracy among respondents to misrepresent or conceal material facts concerning the health hazards of smoking.[28] The predicate duty underlying this claim is a duty not to conspire to commit fraud. For the reasons stated in our analysis of petitioner's intentional fraud claim, this duty is not pre-empted by § 5(b) for it is not a prohibition "based on smoking and health" as that phrase is properly construed. Accordingly, we conclude that the 1969 Act does not pre-empt petitioner's conspiracy claim.

## VI

To summarize our holding: The 1965 Act did not pre-empt state-law damages actions; the 1969 Act pre-empts petitioner's claims based on a failure to warn and the neutralization

---

as based on smoking and health, but rather as based on the broader duty "to inform consumers of known risks." *Post*, at 543. JUSTICE SCALIA contends that, again as a matter of consistency, we should construe fraudulent-misrepresentation claims *not* as based on a general duty not to deceive but rather as "based on smoking and health." Admittedly, each of these positions has some conceptual attraction. However, our ambition here is not theoretical elegance, but rather a fair understanding of congressional purpose.

To analyze failure-to-warn claims at the highest level of generality (as JUSTICE BLACKMUN would have us do) would render the 1969 amendments almost meaningless and would pay too little respect to Congress' substantial reworking of the Act. On the other hand, to analyze fraud claims at the lowest level of generality (as JUSTICE SCALIA would have us do) would conflict both with the background presumption against pre-emption and with legislative history that plainly expresses an intent to preserve the "police regulations" of the States. See n. 25, *supra.*

[28] The District Court described the evidence of conspiracy as follows:

"Evidence presented by [petitioner], particularly that contained in the documents of [respondents] themselves, indicates . . . that the industry of which these [respondents] were and are a part entered into a sophisticated conspiracy. The conspiracy was organized to refute, undermine, and neutralize information coming from the scientific and medical community . . . ." 683 F. Supp., at 1490.

of federally mandated warnings to the extent that those claims rely on omissions or inclusions in respondents' advertising or promotions; the 1969 Act does not pre-empt petitioner's claims based on express warranty, intentional fraud and misrepresentation, or conspiracy.

The judgment of the Court of Appeals is accordingly reversed in part and affirmed in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE KENNEDY and JUSTICE SOUTER join, concurring in part, concurring in the judgment in part, and dissenting in part.

## I

The Court today would craft a compromise position concerning the extent to which federal law pre-empts persons injured by cigarette manufacturers' unlawful conduct from bringing state common-law damages claims against those manufacturers. I, however, find the Court's divided holding with respect to the original and amended versions of the federal statute entirely unsatisfactory. Our precedents do not allow us to infer a scope of pre-emption beyond that which clearly is mandated by Congress' language. In my view, *neither* version of the federal legislation at issue here provides the kind of unambiguous evidence of congressional intent necessary to displace state common-law damages claims. I therefore join Parts I, II, III, and IV of the Court's opinion, but dissent from Parts V and VI.

## A

I agree with the Court's exposition, in Part III of its opinion, of the underlying principles of pre-emption law, and in particular with its recognition that the pre-emptive scope of the Federal Cigarette Labeling and Advertising Act (1965 Act or Act) and the Public Health Cigarette Smoking Act of

1969 (1969 Act) is "governed entirely by the express language" of the statutes' pre-emption provisions. *Ante,* at 517. Where, as here, Congress has included in legislation a specific provision addressing—and indeed, entitled—pre-emption, the Court's task is one of statutory interpretation—only to "identify the domain expressly pre-empted" by the provision. *Ibid.* An interpreting court must "'begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'" *FMC Corp.* v. *Holliday,* 498 U. S. 52, 57 (1990) (quoting *Park 'N Fly, Inc.* v. *Dollar Park & Fly, Inc.,* 469 U. S. 189, 194 (1985)). See *California Coastal Comm'n* v. *Granite Rock Co.,* 480 U. S. 572, 591–593 (1987); *California Federal Savings & Loan Assn.* v. *Guerra,* 479 U. S. 272, 282 (1987) (opinion of Marshall, J.). We resort to principles of implied pre-emption—that is, inquiring whether Congress has occupied a particular field with the intent to supplant state law or whether state law actually conflicts with federal law, see *English* v. *General Electric Co.,* 496 U. S. 72, 79 (1990)—only when Congress has been silent with respect to pre-emption.

I further agree with the Court that we cannot find the state common-law damages claims at issue in this case pre-empted by federal law in the absence of clear and unambiguous evidence that Congress intended that result. See *ante,* at 516. The Court describes this reluctance to infer pre-emption in ambiguous cases as a "presumption against the pre-emption of state police power regulations." *Ante,* at 518. Although many of the cases in which the Court has invoked such a presumption against displacement of state law have involved implied pre-emption, see, *e. g., Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U. S. 132, 146–152 (1963); *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 236–237 (1947), this Court often speaks in general terms without reference to the nature of the pre-emption at issue in the given statutory scheme. See, *e. g., Maryland* v. *Loui-*

*siana,* 451 U. S. 725, 746 (1981) ("Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law"); *Avocado Growers,* 373 U. S., at 146–147 ("[W]e are not to conclude that Congress legislated the ouster of this [state] statute ... in the absence of an unambiguous congressional mandate to that effect"); *Bethlehem Steel Co.* v. *New York State Labor Relations Bd.,* 330 U. S. 767, 780 (1947) ("Any indulgence in construction should be in favor of the States, because Congress can speak with drastic clarity whenever it chooses to assure full federal authority, completely displacing the States") (opinion of Frankfurter, J.).

The principles of federalism and respect for state sovereignty that underlie the Court's reluctance to find preemption where Congress has not spoken directly to the issue apply with equal force where Congress has spoken, though ambiguously. In such cases, the question is not *whether* Congress intended to pre-empt state regulation, but to what *extent.* We do not, absent unambiguous evidence, infer a scope of pre-emption beyond that which clearly is mandated by Congress' language.[1] I therefore agree with the Court's unwillingness to conclude that the state common-law damages claims at issue in this case are pre-empted unless such result is " 'the clear and manifest purpose of Congress.' " *Ante,* at 516 (quoting *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S., at 230).

### B

I also agree with the Court's application of the foregoing principles in Part IV of its opinion, where it concludes that

---

[1] The Court construes congressional inroads on state power narrowly in other contexts, as well. For example, the Court repeatedly has held that, in order to waive a State's sovereign immunity from suit in federal court, Congress must make its intention "unmistakably clear in the language of the statute." *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 242 (1985); *Dellmuth* v. *Muth,* 491 U. S. 223, 228 (1989).

none of petitioner's common-law damages claims are pre-empted by the 1965 Act. In my view, the words of § 5(b) of that Act ("No statement relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act") can bear only one meaning: that States are prohibited merely from "mandating particular cautionary statements . . . in cigarette advertisements." *Ante,* at 518. As the Court recognizes, this interpretation comports with Congress' stated purpose of avoiding " 'diverse, nonuniform, and confusing cigarette labeling and advertising *regulations*' " relating to smoking and health. *Ante,* at 519 (quoting 15 U. S. C. § 1331(2)). The narrow scope of federal pre-emption is thus apparent from the statutory text, and it is correspondingly impossible to divine any "clear and manifest purpose" on the part of Congress to pre-empt common-law damages actions.

## II

My agreement with the Court ceases at this point. Given the Court's proper analytical focus on the scope of the express pre-emption provisions at issue here and its acknowledgment that the 1965 Act does not pre-empt state common-law damages claims, I find the plurality's conclusion that the 1969 Act pre-empts at least some common-law damages claims little short of baffling. In my view, the modified language of § 5(b), 15 U. S. C. § 1334(b) ("No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act"), no more "clearly" or "manifestly" exhibits an intent to pre-empt state common-law damages actions than did the language of its predecessor in the 1965 Act. Nonetheless, the plurality reaches a different conclusion, and its reasoning warrants scrutiny.

## A

The plurality premises its pre-emption ruling on what it terms the "substantial changes" wrought by Congress in § 5(b), *ante*, at 520, notably, the rewording of the provision to pre-empt any "requirement or prohibition" (as opposed merely to any "statement") "imposed under State law." As an initial matter, I do not disagree with the plurality that the phrase "State law," in an appropriate case, can encompass the common law as well as positive enactments such as statutes and regulations. See *ante*, at 522–523. I do disagree, however, with the plurality's conclusion that "State law" as used in § 5(b) represents such an all-inclusive reference. Congress' intention in selecting that phrase cannot be understood without considering the narrow range of actions—any "requirement or prohibition"—that Congress specifically described in § 5(b) as "imposed under" state law. See *United States* v. *Morton*, 467 U. S. 822, 828 (1984) ("We do not . . . construe statutory phrases in isolation; we read statutes as a whole. Thus, the words [in question] must be read in light of the immediately following phrase" (footnote omitted)); *Jarecki* v. *G. D. Searle & Co.*, 367 U. S. 303, 307 (1961) ("The maxim *noscitur a sociis*, that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress"); see also *Norfolk & Western R. Co.* v. *Train Dispatchers*, 499 U. S. 117, 138–139 (1991) (STEVENS, J., dissenting) (declining to read the phrase "all other law, including State and municipal law," broadly).

Although the plurality flatly states that the phrase "no requirement or prohibition" "sweeps broadly" and "easily encompass[es] obligations that take the form of common-law rules," *ante*, at 521, those words are in reality far from unambiguous and cannot be said clearly to evidence a congressional mandate to pre-empt state common-law damages actions. The dictionary definitions of these terms suggest, if

anything, specific actions mandated or disallowed by a formal governing authority. See, *e. g.*, Webster's Third New International Dictionary 1929 (1981) (defining "require" as "to ask for authoritatively or imperatively: claim by right and authority" and "to demand as necessary or essential (as on general principles or in order to comply with or satisfy some regulation)"); Black's Law Dictionary 1212 (6th ed. 1990) (defining "prohibition" as an "[a]ct or law prohibiting something"; an "interdiction").

More important, the question whether common-law damages actions exert a regulatory effect on manufacturers analogous to that of positive enactments—an assumption crucial to the plurality's conclusion that the phrase "requirement or prohibition" encompasses common-law actions—is significantly more complicated than the plurality's brief quotation from *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 247 (1959), see *ante*, at 521, would suggest.

The effect of tort law on a manufacturer's behavior is necessarily indirect. Although an award of damages by its very nature attaches additional consequences to the manufacturer's continued unlawful conduct, no particular course of action (*e. g.*, the adoption of a new warning label) is required. A manufacturer found liable on, for example, a failure-to-warn claim may respond in a number of ways. It may decide to accept damages awards as a cost of doing business and not alter its behavior in any way. See *Goodyear Atomic Corp.* v. *Miller*, 486 U. S. 174, 185–186 (1988) (corporation "may choose to disregard [state] safety regulations and simply pay an additional" damages award if an employee is injured as a result of a safety violation). Or, by contrast, it may choose to avoid future awards by dispensing warnings through a variety of alternative mechanisms, such as package inserts, public service advertisements, or general educational programs. The level of choice that a defendant retains in shaping its own behavior distinguishes the indirect regulatory effect of the common law from positive enact-

ments such as statutes and administrative regulations. See *Dewey* v. *R. J. Reynolds Tobacco Co.*, 121 N. J. 69, 90, 577 A. 2d 1239, 1249 (1990); Garner, Cigarette Dependency and Civil Liability: A Modest Proposal, 53 S. Cal. L. Rev. 1423, 1454 (1980). Moreover, tort law has an entirely separate function—compensating victims—that sets it apart from direct forms of regulation. See *Ferebee* v. *Chevron Chemical Co.*, 237 U. S. App. D. C. 164, 175, 736 F. 2d 1529, 1540, cert. denied, 469 U. S. 1062 (1984).

Despite its earlier acknowledgment, consistent with the foregoing conception of damages actions, that "there is no general, inherent conflict between federal pre-emption of state warning requirements and the continued vitality of state common-law damages actions," *ante*, at 518,[2] the plurality apparently finds *Garmon*'s statement that "regulation can be as effectively exerted through an award of damages as through some form of preventive relief," 359 U. S., at 247, sufficient authority to warrant extinguishing the common-law actions at issue in this case. See *ante*, at 521. I am not persuaded. Not only has the Court previously distinguished *Garmon*,[3] but it has declined on several recent occasions to find the regulatory effects of state tort law direct or substantial enough to warrant pre-emption.

In *Goodyear Atomic Corp.* v. *Miller*, for example, the Court distinguished, for purposes of pre-emption analysis,

---

[2] Congress, in fact, has expressly allowed common-law damages actions to survive while pre-empting other, more direct forms of state regulation. See, *e. g.*, Comprehensive Smokeless Tobacco Health Education Act of 1986, §7, 100 Stat. 34, 15 U. S. C. §4406; Occupational Safety and Health Act of 1970, 84 Stat. 1590, 29 U. S. C. §651 *et seq.*, as construed in *Gade* v. *National Solid Wastes Management Assn.*, *ante*, p. 88.

[3] The Court has explained that *Garmon*, in which a state common-law damages award was found to be pre-empted by the National Labor Relations Act, involved a special "presumption of federal pre-emption" relating to the primary jurisdiction of the National Labor Relations Board. See *Brown* v. *Hotel Employees*, 468 U. S. 491, 502 (1984); *English* v. *General Electric Co.*, 496 U. S. 72, 86–87, n. 8 (1990).

"direct state regulation" of safety matters from "the incidental regulatory effects" of damages awarded pursuant to a state workers' compensation law. 486 U. S., at 185. Relying in part on its earlier decision in *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 256 (1984),[4] the Court stated that "Congress may reasonably determine that incidental regulatory pressure is acceptable, whereas direct regulatory authority is not." 486 U. S., at 186. Even more recently, the Court declined in *English* v. *General Electric Co.*, 496 U. S., at 86, to find state common-law damages claims for emotional distress pre-empted by federal nuclear energy law. The Court concluded that, although awards to former employees for emotional distress would attach "additional consequences" to retaliatory employer conduct and could lead employers to alter the underlying conditions about which employees were complaining, *ibid.*, such an effect would be "neither direct nor substantial enough" to warrant pre-emption. *Id.*, at 85.

In light of the recognized distinction in this Court's jurisprudence between direct state regulation and the indirect regulatory effects of common-law damages actions, it cannot be said that damages claims are clearly or unambiguously "requirements" or "prohibitions" imposed under state law.

---

[4]The Court in *Silkwood* declined to find state punitive damages awards pre-empted by federal nuclear safety laws, explaining: "It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept." 464 U. S., at 256. Although the Court has noted that the decision in *Silkwood* was based in "substantial part" on affirmative evidence in the legislative history suggesting that Congress did not intend to include common-law damages remedies within the pre-empted field, see *English* v. *General Electric Co.*, 496 U. S. 72, 86 (1990), *Silkwood's* discussion of the regulatory effects of the common law is instructive and has been relied on in subsequent cases. See, *e. g.*, *Goodyear*, 486 U. S., at 186.

The plain language of the 1969 Act's modified pre-emption provision simply cannot bear the broad interpretation the plurality would impart to it.

B

Not only does the text of the revised § 5(b) fail clearly or manifestly to require pre-emption of state common-law damages actions, but there is no suggestion in the legislative history that Congress intended to expand the scope of the pre-emption provision when it amended the statute in 1969. The plurality acknowledges the evidence that Congress itself perceived the changes in § 5(b) to be a mere "'clarifi[cation]'" of the existing narrow pre-emption provision, *ante*, at 520 (quoting S. Rep. No. 91–566, p. 12 (1969) (hereinafter S. Rep.)), but it dismisses these statements of legislative intent as the "'views of a subsequent Congress.'" *Ante*, at 520 (quoting *United States* v. *Price*, 361 U. S. 304, 313 (1960)). The plurality is wrong not only as a factual matter—for the statements of the Congress that amended § 5(b) are contemporaneous, not "subsequent," to enactment of the revised pre-emption provision—but as a legal matter, as well. This Court accords "great weight" to an amending Congress' interpretation of the underlying statute. See, *e. g.*, *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 380–381, and n. 8 (1969).

Viewing the revisions to § 5(b) as generally nonsubstantive in nature makes sense. By replacing the word "statement" with the slightly broader term, "requirement," and adding the word "prohibition" to ensure that a State could not do through negative mandate (*e. g.*, banning all cigarette advertising) that which it already was forbidden to do through positive mandate (*e. g.*, mandating particular cautionary statements), Congress sought to "clarif[y]" the existing pre-

cautions against confusing and nonuniform state laws and regulations.  S. Rep., at 12.[5]

Just as it acknowledges the evidence that Congress' changes in the pre-emption provision were nonsubstantive, the plurality admits that "portions of the legislative history of the 1969 Act suggest that Congress was primarily concerned with positive enactments by States and localities." *Ante*, at 521.  Indeed, the relevant Senate Report explains that the revised pre-emption provision is "intended to include not only action by State statute but by all other administrative actions or local ordinances or regulations by any political subdivisions of any State," a list remarkable for the absence of any reference to common-law damages actions. S. Rep., at 12.  Cf., *e. g.*, 29 U. S. C. §§ 1144(a) and (c)(1) (ERISA statute defines "any and all State laws" as used in pre-emption provision to mean "all laws, *decisions*, rules, regulations, or *other State action* having the effect of law") (emphasis added).  The plurality dismisses this statement with the simple observation that "the language of the Act plainly reaches beyond such [positive] enactments." *Ante*, at 521.  Yet, as discussed above, the words of § 5(b) ("requirement or prohibition") do not so "plainly" extend to common-law damages actions, and the plurality errs in placing so much weight on this fragile textual hook.

The plurality further acknowledges that, at the same time that Congress amended the pre-emption provision of § 5(b), it made no effort to alter the statement of purpose contained in § 2 of the 1965 Act.  *Ante*, at 521, n. 19.  Although the

---

[5] In the one reported case construing the scope of pre-emption under the 1965 Act, *Banzhaf* v. *FCC*—a case of which Congress was aware, see S. Rep., at 7—the Court of Appeals for the District of Columbia Circuit used the term "affirmative requirements" to describe § 5(b)'s ban on "statement[s]."  132 U. S. App. D. C. 14, 22, 405 F. 2d 1082, 1090 (1968), cert. denied *sub nom. Tobacco Institute, Inc.* v. *FCC*, 396 U. S. 842 (1969).  It is but a small step from "affirmative requirement" to the converse, "negative requirement" ("prohibition"), and, from there, to the single explanatory phrase, "requirement or prohibition."

plurality relegates this fact to a footnote, the continued vitality of §2 is significant, particularly in light of the Court's reliance on the same statement of purpose for its earlier conclusion that the 1965 Act does *not* pre-empt state common-law damages actions. See *ante*, at 519 (concluding that Congress' expressed intent to avoid diverse, nonuniform, and confusing regulations "most naturally refers to positive enactments by [state legislatures and federal agencies], not to common-law damages actions").

Finally, there is absolutely no suggestion in the legislative history that Congress intended to leave plaintiffs who were injured as a result of cigarette manufacturers' unlawful conduct without any alternative remedies; yet that is the regrettable effect of the ruling today that many state common-law damages claims are pre-empted. The Court in the past has hesitated to find pre-emption where federal law provides no comparable remedy. See Rabin, A Sociolegal History of the Tobacco Tort Litigation, 44 Stan. L. Rev. 853, 869 (1992) (noting the "rather strong tradition of federal deference to competing state interests in compensating injury victims"). Indeed, in *Silkwood,* the Court took note of "Congress' failure to provide any federal remedy" for injured persons, and stated that it was "difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct." 464 U. S., at 251. See also *id.,* at 263 (BLACKMUN, J., dissenting) ("[I]t is inconceivable that Congress intended to leave victims with no remedy at all").

Unlike other federal statutes where Congress has eased the bite of pre-emption by establishing "comprehensive" civil enforcement schemes, see, *e. g., Ingersoll-Rand Co.* v. *McClendon,* 498 U. S. 133, 144–145 (1990) (discussing §502(a) of ERISA), the Cigarette Labeling and Advertising Act is barren of alternative remedies. The Act merely empowers the Federal Trade Commission to regulate unfair or deceptive advertising practices (15 U. S. C. §1336), establishes minimal

criminal penalties (misdemeanor and fine not to exceed $10,000) for violations of the Act's provisions (§ 1338), and authorizes federal courts, upon the Government's application, to enjoin violations of the Act (§ 1339). Unlike the plurality, I am unwilling to believe that Congress, without any mention of state common-law damages actions or of its intention dramatically to expand the scope of federal pre-emption, would have eliminated the only means of judicial recourse for those injured by cigarette manufacturers' unlawful conduct.

Thus, not only does the plain language of the 1969 Act fail clearly to require pre-emption of petitioner's state common-law damages claims, but there is no suggestion in the legislative history that Congress intended to expand the scope of the pre-emption provision in the drastic manner that the plurality attributes to it. Our obligation to infer pre-emption only where Congress' intent is clear and manifest mandates the conclusion that state common-law damages actions are not pre-empted by the 1969 Act.[6]

## III

Stepping back from the specifics of the plurality's pre-emption analysis to view the result the plurality ultimately reaches, I am further disturbed. Notwithstanding the Court's ready acknowledgment that " ' "[t]he purpose of Congress is the ultimate touchstone" ' of pre-emption analysis," *ante*, at 516 (quoting *Malone* v. *White Motor Corp.*, 435 U. S. 497, 504 (1978)), the plurality proceeds to create a crazy quilt

---

[6] Every Court of Appeals to consider the question, including the Third Circuit in an earlier opinion in this case, similarly has concluded that state common-law damages claims are *not* expressly pre-empted under the 1969 Act. See, *e. g., Cipollone* v. *Liggett Group, Inc.*, 789 F. 2d 181, 185–186 (CA3 1986), cert. denied, 479 U. S. 1043 (1987); *Pennington* v. *Vistron Corp.*, 876 F. 2d 414, 418 (CA5 1989); *Roysdon* v. *R. J. Reynolds Tobacco Co.*, 849 F. 2d 230, 234 (CA6 1988); *Palmer* v. *Liggett Group, Inc.*, 825 F. 2d 620, 625 (CA1 1987). See also *Dewey* v. *R. J. Reynolds Tobacco Co.*, 121 N. J. 69, 85, 577 A. 2d 1239, 1247 (1990); *Forster* v. *R. J. Reynolds Tobacco Co.*, 437 N. W. 2d 655, 658 (Minn. 1989).

of pre-emption from among the common-law claims implicated in this case, and in so doing reaches a result that Congress surely could not have intended.

The most obvious problem with the plurality's analysis is its frequent shift in the level of generality at which it examines the individual claims. For example, the plurality states that fraudulent-misrepresentation claims (at least those involving false statements of material fact in advertisements) are "predicated not on a duty 'based on smoking and health' but rather on a more general obligation—the duty not to deceive," and therefore are not pre-empted by § 5(b) of the 1969 Act. *Ante,* at 528–529. Yet failure-to-warn claims—which could just as easily be described as based on a "more general obligation" to inform consumers of known risks—implicitly are found to be "based on smoking and health" and are declared pre-empted. See *ante,* at 524. The plurality goes on to hold that express warranty claims are not pre-empted because the duty at issue is undertaken by the manufacturer and is not "imposed under State law." *Ante,* at 525. Yet, as the plurality itself must acknowledge, "the *general duty* not to breach warranties arises under state law," *ibid.* (emphasis added); absent the State's decision to penalize such behavior through the creation of a common-law damages action, no warranty claim would exist.

In short, I can perceive no principled basis for many of the plurality's asserted distinctions among the common-law claims, and I cannot believe that Congress intended to create such a hodgepodge of allowed and disallowed claims when it amended the pre-emption provision in 1970. Although the plurality acknowledges that § 5(b) fails to "indicate that any familiar subdivision of common-law claims is or is not pre-empted," *ante,* at 523, it ignores the simplest and most obvious explanation for the statutory silence: that Congress never intended to displace state common-law damages claims, much less to cull through them in the manner the plurality does today. I can only speculate as to the difficulty

lower courts will encounter in attempting to implement today's decision.

## IV

By finding federal pre-emption of certain state common-law damages claims, the decision today eliminates a critical component of the States' traditional ability to protect the health and safety of their citizens. Yet such a radical re-adjustment of federal-state relations is warranted under this Court's precedents only if there is clear evidence that Congress intended that result. Because I believe that neither version of the Federal Cigarette Labeling and Advertising Act evidences such a clear congressional intent to pre-empt state common-law damages actions, I respectfully dissent from Parts V and VI of JUSTICE STEVENS' opinion.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in the judgment in part and dissenting in part.

Today's decision announces what, on its face, is an extra-ordinary and unprecedented principle of federal statutory construction: that express pre-emption provisions must be construed narrowly, "in light of the presumption against the pre-emption of state police power regulations." *Ante,* at 518. The life span of this new rule may have been blessedly brief, inasmuch as the opinion that gives it birth in Part I proceeds to ignore it in Part V, by adjudging at least some of the common-law tort claims at issue here pre-empted. In my view, there is no merit to this newly crafted doctrine of narrow construction. Under the Supremacy Clause, U. S. Const., Art. VI, cl. 2, our job is to interpret Congress's decrees of pre-emption neither narrowly nor broadly, but in accordance with their apparent meaning. If we did that job in the present case, we would find, under the 1965 Act, pre-emption of petitioner's failure-to-warn claims; and under the 1969 Act, we would find pre-emption of petitioner's claims complete.

## I

The Court's threshold description of the law of preemption is accurate enough: Though we generally "'assum[e] that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress,'" *ante,* at 516 (quoting *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 230 (1947)), we have traditionally not thought that to require express statutory text.. Where state law is in actual conflict with federal law, see, *e. g., Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation and Development Comm'n,* 461 U. S. 190, 204 (1983), or where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines* v. *Davidowitz,* 312 U. S. 52, 67 (1941), or even where the nature of Congress's regulation, or its scope, convinces us that "Congress left no room for the States to supplement it," *Rice, supra,* at 230, we have had no difficulty declaring that state law must yield. The ultimate question in each case, as we have framed the inquiry, is one of Congress's intent, as revealed by the text, structure, purposes, and subject matter of the statutes involved. See, *e. g., English* v. *General Electric Co.,* 496 U. S. 72, 78–79 (1990); *Shaw* v. *Delta Air Lines, Inc.,* 463 U. S. 85, 95 (1983).

The Court goes beyond these traditional principles, however, to announce two new ones. First, it says that express pre-emption provisions must be given the narrowest possible construction. This is in its view the consequence of our oft-repeated assumption that, absent convincing evidence of statutory intent to pre-empt, "'the historic police powers of the States [are] not to be superseded,'" see *ante,* at 516. But it seems to me that assumption dissolves once there is conclusive evidence of intent to pre-empt in the express words of the statute itself, and the only remaining question is what the *scope* of that pre-emption is meant to be. Thereupon, I think, our responsibility is to apply to the text ordinary principles of statutory construction.

That is precisely what our express pre-emption cases have done. Less than a month ago, in *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374 (1992), we held that the Airline Deregulation Act's provision pre-empting state laws "relating to [airline] rates, routes, or services," 49 U. S. C. App. § 1305(a)(1), was broad enough to reach state fare advertising regulations despite the availability of plausible limiting constructions. We made no mention of any "plain-statement" rule, or rule of narrow construction, but applied the usual "'"*assumption that the ordinary meaning of [the statutory] language accurately expresses the legislative purpose.*"'" *Morales, supra,* at 383 (quoting *FMC Corp.* v. *Holliday,* 498 U. S. 52, 57 (1990)) (emphasis added). And last Term, in *Norfolk & Western R. Co.* v. *Train Dispatchers,* 499 U. S. 117 (1991), we interpreted an express pre-emption provision broadly despite the fact that a well-respected canon of statutory construction supported a narrower reading. See. *id.,* at 129; *id.,* at 136 (STEVENS, J., dissenting). We said not a word about a "presumption against . . . pre-emption," *ante,* at 518, that was to be applied to construction of the text.

In light of our willingness to find pre-emption in the absence of *any* explicit statement of pre-emptive intent, the notion that such explicit statements, where they exist, are subject to a "plain-statement" rule is more than somewhat odd. To be sure, our jurisprudence abounds with rules of "plain statement," "clear statement," and "narrow construction" designed variously to ensure that, absent unambiguous evidence of Congress's intent, extraordinary constitutional powers are not invoked, or important constitutional protections eliminated, or seemingly inequitable doctrines applied. See, *e. g., United States* v. *Mitchell,* 445 U. S. 535, 538 (1980) (waivers of federal sovereign immunity must be "unequivocally expressed"); *Will* v. *Michigan Dept. of State Police,* 491 U. S. 58, 65 (1989) (clear statement required to compel States to entertain damages suits against themselves in state

courts); *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 243 (1985) (abrogation of state sovereign immunity must be expressed "in unmistakable language"). But *none* of those rules exists alongside a doctrine whereby the same result so prophylactically protected from careless explicit provision can be achieved *by sheer implication,* with no express statement of intent at all. That is the novel regime the Court constructs today.

The results seem odder still when one takes into account the second new rule that the Court announces: "When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, . . . we need only identify the domain expressly pre-empted by [that provision]." *Ante,* at 517. Once there is an express pre-emption provision, in other words, all doctrines of implied pre-emption are eliminated. This proposition may be correct insofar as implied "field" pre-emption is concerned: The existence of an express pre-emption provision tends to contradict any inference that Congress intended to occupy a field broader than the statute's express language defines. However, with regard to implied "conflict" pre-emption—*i. e.,* where state regulation actually conflicts with federal law, or where state regulation "stands as an obstacle to the accomplishment and execution" of Congress's purposes, *Hines, supra,* at 67—the Court's second new rule works mischief. If taken seriously, it would mean, for example, that if a federal consumer protection law provided that no state agency or court shall assert jurisdiction under state law over any workplace safety issue with respect to which a federal standard is in effect, then a state agency operating under a law dealing with a subject other than workplace safety (*e. g.,* consumer protection) could impose requirements entirely contrary to federal law—forbidding, for example, the use of certain safety equipment that federal law requires. To my knowledge, we have never expressed such a rule before, and our prior cases are inconsist-

ent with it.  See, *e. g., Jones* v. *Rath Packing Co.*, 430 U. S. 519, 540–543 (1977).  When this second novelty is combined with the first, the result is extraordinary: The statute that says *anything* about pre-emption must say *everything;* and it must do so with great exactitude, as any ambiguity concerning its scope will be read in favor of preserving state power.  If this is to be the law, surely only the most sporting of Congresses will dare to say anything about pre-emption.

The proper rule of construction for express pre-emption provisions is, it seems to me, the one that is customary for statutory provisions in general: Their language should be given its ordinary meaning.  *FMC Corp.* v. *Holliday, supra,* at 57; *Shaw* v. *Delta Air Lines,* 463 U. S., at 97.  When this suggests that the pre-emption provision was intended to sweep broadly, our construction must sweep broadly as well. See, *e. g., id.,* at 96–97.  And when it bespeaks a narrow scope of pre-emption, so must our judgment.  See, *e. g., Fort Halifax Packing Co.* v. *Coyne,* 482 U. S. 1, 7–8 (1987).  Applying its niggardly rule of construction, the Court finds (not surprisingly) that none of petitioner's claims—common-law failure to warn, breach of express warranty, and intentional fraud and misrepresentation—is pre-empted under § 5(b) of the 1965 Act.  And save for the failure-to-warn claims, the Court reaches the same result under § 5(b) of the 1969 Act. I think most of that is error.  Applying ordinary principles of statutory construction, I believe petitioner's failure-to-warn claims are pre-empted by the 1965 Act, and all his common-law claims by the 1969 Act.

## II

With much of what the plurality says in Part V of its opinion I agree—that "the language of the [1969] Act plainly reaches beyond [positive] enactments," *ante,* at 521; that the general tort-law duties petitioner invokes against the cigarette companies can, as a general matter, impose "requirement[s] or prohibition[s]" within the meaning of § 5(b) of the

1969 Act, *ibid.;* and that the phrase "State law" as used in that provision embraces state common law, *ante,* at 523. I take issue with the plurality, however, on its application of these general principles to the present case. Its finding that they produce only partial pre-emption of petitioner's common-law claims rests upon three misperceptions that I shall discuss in turn, under headings indicating the erroneously permitted claims to which they apply.

## A

### *Pre-1969 Failure-to-Warn Claims*

According to the Court,[1] § 5(b) of the 1965 Act "is best read as having superseded only positive enactments by legislatures or administrative agencies that mandate *particular* warning labels." *Ante,* at 518–519 (emphasis added). In essence, the Court reads § 5(b)'s critical language "No *statement* relating to smoking and health . . . shall be required" to mean "No *particular statement* relating to smoking and health shall be required." The Court reasons that because common-law duties do not require cigarette manufacturers to include any *particular* statement in their advertising, but only *some* statement warning of health risks, those duties survive the 1965 Act. I see no basis for this element of "particularity." To require a warning about cigarette health risks is to require a "statement relating to smoking and health." If the "presumption against . . . pre-emption," *ante,* at 518, requires us to import limiting language into the 1965 Act, I do not see why it does not require us to import similarly limiting language into the 1969 Act—so that a "requirement . . . based on smoking and health . . . with respect to advertising" means only a *specific* requirement, and not just general, noncigarette-specific duties imposed by tort law. The divergent treatment of the 1965 Act cannot be jus-

---

[1] The plurality is joined by JUSTICES BLACKMUN, KENNEDY, and SOUTER in its analysis of the 1965 Act.

tified by the Act's statement of purposes, which, as the Court notes, expresses concern with "diverse, nonuniform, and confusing cigarette labeling and advertising *regulations*." 15 U. S. C. § 1331(2) (emphasis added). That statement of purposes was left untouched by Congress in 1969, and thus should be as restrictive of the scope of the later § 5(b) as the Court believes it is of the scope of the earlier one.[2]

To the extent petitioner's claims are premised specifically on respondents' failure (during the period in which the 1965 Act was in force) to include in their *advertising* any statement relating to smoking and health, I would find those claims, no less than the similar post-1969 claims, pre-empted. In addition, for reasons I shall later explain, see Part III, *infra,* I would find pre-emption even of those claims based on respondents' failure to make health-related statements to consumers *outside* their advertising. However, since § 5(b) of the 1965 Act enjoins only those laws that *require* "statement[s]" in cigarette advertising, those of petitioner's claims that, if accepted, would penalize statements *voluntarily* made by the cigarette companies must be deemed to survive. As these would appear to include petitioner's breach-of-express-warranty and intentional fraud and misrepresentation claims, I concur in the Court's judgment in this respect.

---

[2] The Court apparently thinks that because § 4 of the Act, imposing the federal package-labeling requirement, "itself sets forth a *particular* statement," *ante,* at 519, n. 16, § 5(b), the advertising pre-emption provision must be read to proscribe only those state laws that compel the use of *particular* statements in advertising. Besides being a complete *non sequitur*, this reasoning proves too much: The similar prescription of a *particular* warning in the 1969 Act would likewise require us to confine the pre-emptive scope of that later statute to specific, prescriptive "requirement[s] or prohibition[s]" (which, I presume, would not include tort-law obligations to warn consumers about product dangers). And under both the 1965 and 1969 versions of the Act, the package-labeling pre-emption provision of § 5(a), no less than the advertising pre-emption provision of § 5(b), would have to be limited to the prescription of *particular* language, leaving the States free to impose general health-labeling requirements. These results are obviously contrary to the Act's stated purposes.

B

*Post-1969 Breach-of-Express-Warranty Claims*

In the context of this case, petitioner's breach-of-express-warranty claim necessarily embodies an assertion that respondents' advertising and promotional materials made statements to the effect that cigarette smoking is not unhealthy. Making such statements civilly actionable certainly constitutes an advertising "requirement or prohibition . . . based on smoking and health." The plurality appears to accept this, but finds that liability for breach of express warranty is not "imposed under State law" within the meaning of § 5(b) of the 1969 Act. "[R]ather," it says, the duty "is best understood as undertaken by the manufacturer itself." *Ante*, at 526. I cannot agree.

When liability attaches to a particular promise or representation, it attaches *by law*. For the making of a voluntary promise or representation, no less than for the commission of an intentional tort, it is the background law against which the act occurs, and not the act itself, that supplies the element of legal obligation. See *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398, 429 (1934); N. J. Stat. Ann. §§ 12A:2–313(1), 12A:2–714, and 12A:2–715 (West 1962) (providing for enforcement of express warranties). Of course, New Jersey's law of express warranty attaches legal consequences to the cigarette manufacturer's voluntary conduct in making the warranty, and in that narrow sense, I suppose, the warranty obligation can be said to be "undertaken by the manufacturer." But on that logic it could also be said that the duty to warn about the dangers of cigarettes is undertaken voluntarily by manufacturers when they choose to sell in New Jersey; or, more generally, that *any* legal duty imposed on volitional behavior is not one imposed by law.

The plurality cites no authority for its curious view, which is reason enough to doubt it. In addition, however, we rejected this very argument last Term in *Norfolk & Western*

*R. Co.* v. *Train Dispatchers,* where we construed a federal exemption "from the antitrust laws and from all other law," 49 U. S. C. § 11341(a), to include an exemption from contract obligations. We observed, in a passage flatly inconsistent with the plurality's analysis today, that "[a] contract has no legal force *apart from the law that acknowledges its binding character.*" 499 U. S., at 130. Cf. *id.,* at 139 (STEVENS, J., dissenting). I would find petitioner's claim for breach of express warranty pre-empted by § 5(b) of the 1969 Act.

## C

### Post-1969 Fraud and Misrepresentation Claims

According to the plurality, at least one of petitioner's intentional fraud and misrepresentation claims survives § 5(b) of the 1969 Act because the common-law duty underlying that claim is not "based on smoking and health" within the meaning of the Act. See *ante,* at 528–529. If I understand the plurality's reasoning, it proceeds from the implicit assumption that only duties deriving from laws that are specifically directed to "smoking and health," or that are uniquely crafted to address the relationship between cigarette companies and their putative victims, fall within § 5(b) of the Act, as amended. Given that New Jersey's tort-law "duty not to deceive," *ante,* at 529, is a general one, applicable to all commercial actors and all kinds of commerce, it follows from this assumption that § 5(b) does not pre-empt claims based on breaches of that duty.

This analysis is suspect, to begin with, because the plurality is unwilling to apply it consistently. As JUSTICE BLACKMUN cogently explains, see *ante,* at 543 (opinion concurring in part and dissenting in part), if New Jersey's common-law duty to avoid false statements of material fact—as applied to the cigarette companies' behavior—is not "based on smoking and health," the same must be said of New Jersey's common-law duty to warn about a product's dangers. *Each* duty transcends the relationship between the cigarette com-

panies and cigarette smokers; *neither* duty was specifically crafted with an eye toward "smoking and health." None of the arguments the plurality advances to support its distinction between the two is persuasive. That Congress specifically preserved, in both the 1965 and 1969 Acts, the Federal Trade Commission's authority to police deceptive advertising practices, see § 5(c) of the 1965 Act; § 7(b) of the 1969 Act; *ante*, at 529, does not suggest that Congress intended comparable state authority to survive § 5(b). In fact, at least in the 1965 Act (which generally excluded federal as well as state regulation), the exemption suggested that § 5(b) was broad enough to reach laws governing fraud and misrepresentation. And it is not true that the States' laws governing fraud and misrepresentation in advertising impose identical legal standards, whereas their laws "concerning the warning necessary to render a product 'reasonably safe'" are quite diverse, *ibid.* The question whether an ad featuring a glamorous, youthful smoker with pearly-white teeth is "misrepresentative" would almost certainly be answered differently from State to State. See *ante*, at 527 (discussing FTC's initial cigarette advertising rules).

Once one is forced to select a *consistent* methodology for evaluating whether a given legal duty is "based on smoking and health," it becomes obvious that the methodology must focus not upon the ultimate source of the duty (*e. g.*, the common law) but upon its proximate application. Use of the "ultimate source" approach (*i. e.*, a legal duty is not "based on smoking and health" unless the law from which it derives is directed only to smoking and health) would gut the statute, inviting the very "diverse, nonuniform, and confusing cigarette . . . advertising regulations" Congress sought to avoid. 15 U. S. C. § 1331(2). And the problem is not simply the common law: Requirements could be imposed by state executive agencies as well, so long as they were operating under a *general* statute authorizing their supervision of "commercial advertising" or "unfair trade practices." New

Jersey and many other States have such statutes already on the books. *E. g.,* N. J. Stat. Ann. § 56:8–1 *et seq.* (West 1989); N. Y. Gen. Bus. Law § 349 *et seq.* (McKinney 1988 and Supp. 1992); Texas Bus. & Com. Code Ann. § 17.01 *et seq.* (1987 and Supp. 1992).

I would apply to all petitioner's claims what I have called a "proximate application" methodology for determining whether they invoke duties "based on smoking and health"— I would ask, that is, whether, whatever the source of the duty, it imposes an obligation in this case because of the effect of smoking upon health. On that basis, I would find petitioner's failure-to-warn and misrepresentation claims both pre-empted.

## III

Finally, there is an additional flaw in the plurality's opinion, a systemic one that infects even its otherwise correct disposition of petitioner's post-1969 failure-to-warn claims. The opinion states that, since § 5(b) proscribes only "requirement[s] or prohibition[s] . . . *'with respect to . . . advertising or promotion,'*" state-law claims premised on the failure to warn consumers "through channels of communication other than advertising or promotion" are not covered. *Ante,* at 528 (emphasis added); see *ante,* at 524. This preserves not only the (somewhat fanciful) claims based on duties having no relation to the advertising and promotion (one could imagine a law requiring manufacturers to disclose the health hazards of their products to a state public-health agency), but also claims based on duties that can be complied with by taking action *either* within the advertising and promotional realm *or elsewhere.* Thus, if—as appears to be the case in New Jersey—a State's common law requires manufacturers to advise consumers of their products' dangers, but the law is indifferent as to *how* that requirement is met (*i. e.,* through "advertising or promotion" or otherwise), the plurality would apparently be unprepared to find pre-emption as long

as the jury were instructed not to zero in on deficiencies in the manufacturers' advertising or promotion.

I think that is inconsistent with the law of pre-emption. Advertising and promotion are the normal means by which a manufacturer communicates required product warnings to prospective customers, and by far the most economical means. It is implausible that Congress meant to save cigarette companies from being compelled to convey such data to consumers through that means, only to allow them to be compelled to do so through means more onerous still. As a practical matter, such a "tell-the-consumers-any-way-you-wish" law compels manufacturers to relinquish the advertising and promotion immunity accorded them by the Act. The test for pre-emption in this setting should be one of practical compulsion, *i. e.*, whether the law practically compels the manufacturers to engage in behavior that Congress has barred the States from prescribing directly. Cf., *e. g.*, *Ray* v. *Atlantic Richfield Co.*, 435 U. S. 151, 173, n. 25 (1978). Though the hypothetical law requiring disclosure to a state regulatory agency would seem to survive this test, I would have no difficulty finding that test met with respect to state laws that require the cigarette companies to meet general standards of "fair warning" regarding smoking and health.

\* \* \*

Like JUSTICE BLACKMUN, "I can only speculate as to the difficulty lower courts will encounter in attempting to implement [today's] decision." *Ante*, at 543–544 (opinion concurring in part and dissenting in part). Must express pre-emption provisions really be given their narrowest reasonable construction (as the Court says in Part III), or need they not (as the plurality does in Part V)? Are courts to ignore all doctrines of implied pre-emption whenever the statute at issue contains an express pre-emption provision, as the Court says today, or are they to continue to apply them, as we have in the past? For pre-emption purposes,

does "state law" include legal duties imposed on voluntary acts (as we held last Term in *Norfolk & Western R. Co.*), or does it not (as the plurality says today)? These and other questions raised by today's decision will fill the lawbooks for years to come. A disposition that raises more questions than it answers does not serve the country well.