January 15, 1993 UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT

No. 92-1278

JANE KING,

Plaintiff, Appellant,

v.

COLLAGEN CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. A. David Mazzone, U.S. District Judge]

Before

Torruella, Circuit Judge,

Aldrich and Campbell, Senior Circuit Judges.

Clinard J. Hanby, with whom Susan A. Allinger, John O'Quinn,

O'Quinn, Kerensky & McAninch, Michael M. Essmyer, Michael M.

Essmyer & Associates, Frank Lynch and LeComte, Emanuelson, Tick &

Doyle, were on brief for appellant.

Bob Gibbins and Jeffrey R. White, were on brief for the

Association of Trial Lawyers of America, amicus curiae.
Joseph J. Leghorn, with whom Peter T. Wechsler, Warner &

Stackpole, Joe W. Redden, Jr., W. Curtis Webb, and Beck, Redden &

Secrest, were on brief for appellee.

Bruce N. Kuhlik, Lars Noah, Covington & Burling, Edwin H.

Allen, and Retta M. Riordan, were on brief for Health Industry

Manufacturers Association, amicus curiae.

TORRUELLA, Circuit Judge. Jane King appeals from a

grant of summary judgment entered in favor of Collagen

Corporation ("Collagen") by the United States District Court for

the District of Massachusetts. The district court determined

that plaintiff's claims were preempted by the Medical Device

Amendments of 1976 ("MDA"), 21 U.S.C. 360c et seq. Because the

district court correctly construed the preemption provision of

the MDA, we affirm.

FACTS

Defendant Collagen manufactures and distributes Zyderm,

a cosmetic medical device used to correct wrinkles and other skin

deformities. Zyderm treatment consists of injecting processed

cow tissue directly under the skin. Zyderm then supports the

skin from underneath, smoothing out deformities on the surface of

the skin. The course of treatment may run for several weeks and

requires up to six applications. Researchers at Stanford

University developed Zyderm in the early 1970's and Collagen

placed it on the market in the early 1980's.

As a medical device, Zyderm falls within the scope of

the MDA and thus must be approved and regulated by the Food and

Drug Administration ("FDA"). As a Class III medical device under

the MDA scheme, it is subject to the most extensive pre-marketing

approval requirements imposed by the MDA and to similarly

extensive regulation post-approval. The premarket approval

process is designed to provide a "reasonable assurance of . . .

safety and effectiveness" for medical devices which are too

dangerous or unknown to permit less regulation. 21 U.S.C.

360c(1)(C). Post-approval regulation is designed to keep the FDA

apprised of ongoing safety findings or any other information

about the device as it becomes available. Id. 360e(e) &

360i(a).

Pursuant to the pre-marketing approval process, the FDA

requires applicants to submit proposed labeling, extensive safety

testing data and descriptions of manufacturing methods and

materials. Id. 360e(c)(1). Upon reviewing the materials in a

comprehensive manner, the FDA may approve the device for sale or

return the application to the applicant for further information

or testing. Id. 360e(d)(1). When the FDA returns an

application to the applicant, the FDA must apprise the applicant

of how to correct all deficiencies. Id. 360e(d)(2). Once the

device is approved, the FDA retains the power to withdraw

approval of the product permanently or suspend its approval

temporarily if it determines that the device has become unsafe or

its labeling inadequate. Id. 360e(e)(1)(3). To assist the FDA

in making these determinations, manufacturers must maintain

records and make reports to the FDA on information pertinent to

the device. Id. 360i(a). Zyderm passed through the Class III

approval process prior to marketing, and underwent revisions to

the original approval afterwards.

Appellant Jane King sought Zyderm treatment in 1987.

Following the normal procedure, Ms. King's physician administered

a test dose of Zyderm before proceeding with the full treatment.

Shortly after receiving this test dose, Ms. King suffered muscle

-3-

and joint pains, as well as other symptoms. Her doctor

subsequently diagnosed her as having dermatomyositis/polymyositis

("DM/PM"), an autoimmune disease in which the immune system

attacks skin and muscle tissue as if it were a foreign substance.

When Ms. King received Zyderm, Zyderm's FDA-approved

labeling contraindicated use by those with a personal history of

autoimmune disease. Since that time, however, the FDA has

gradually allowed Collagen to change the labeling as it related

to autoimmune disease. By 1991, Zyderm was no longer

contraindicated for persons with a history of autoimmune disease.

The FDA required a warning in 1991, however, that some recipients

have suffered from unwanted autoimmune reactions, but that no

causal connection between Zyderm and these reactions has been

shown.

Ms. King subsequently filed a first amended complaint

detailing seven claims against Collagen.1 First, she claimed

that Collagen was strictly liable for her injuries because Zyderm

1 Ms. King filed suit against Collagen in 1990 alleging that the
test dose of Zyderm caused her to develop DM/PM. Count one of
her suit alleged that Collagen negligently tested, manufactured
and sold Zyderm. Count two alleged that Collagen breached
implied warranties of merchantability. Count three alleged fraud
and deceit in the sale of Zyderm.

Ms. King subsequently filed the amended complaint. Appellee
contends that Ms. King informed appellee that she would withdraw
this amended complaint. As such, appellee never opposed its
entry. The district court entered the amended complaint, noting
that no opposition was filed. The district court, however,
proceeded to grant summary judgment on the basis of Ms. King's
original complaint. Because the amended complaint contains
essentially similar claims as the original complaint, with few
additions, we will address the claims in the amended complaint.

-4-

was unsafe for its intended purpose and unreasonably dangerous to

users. Second, she alleged that Zyderm was not safe and fit for

the purpose intended and therefore was sold in breach of the

warranty of merchantability. Third, Ms. King alleged that

negligence in the design, manufacture, marketing and sale of

Zyderm, including negligence in not revealing dangerous

propensities of the product, led to her injury. Fourth, she

maintained that Collagen misbranded and/or mislabeled Zyderm.

Fifth, she asserted that Collagen made misrepresentations of

material fact to Ms. King in selling Zyderm to her. Sixth, she

alleged that Collagen failed to warn her of any defective

condition. Finally, Ms. King alleged that Collagen fraudulently

obtained FDA approval.

Collagen moved for summary judgment shortly after

Ms. King filed her amended complaint, arguing that FDA regulation

of Zyderm under the MDA preempted all of the causes of action

alleged in the complaint. The district court granted this

motion, relying on a similar case from the Southern District of

Texas. This case, Stamps v. Collagen Corp., No. H-90-2242, 1991

U.S. Dist. LEXIS 20666 (S.D. Tex. 1991), held that plaintiff's

various products liability claims arising out of Zyderm treatment

were preempted by FDA regulation under the MDA.

LEGAL ANALYSIS

I.

Article VI of the Constitution dictates that federal

law "shall be the supreme Law of the Land; and the judges in

-5-

every State shall be bound thereby, any Thing in the Constitution

or Laws of any State notwithstanding." U.S. Const. art. VI, cl.

2. State laws that conflict with federal laws and regulations,

therefore, are preempted. E.g., Malone v. White Motor Corp., 435

U.S. 497 (1978). In determining whether such a conflict exists,

it is well settled that the intent of Congress governs. That is,

preemption does not occur unless Congress so intended. Rice v.

Santa Fe Elevator Corp., 435 U.S. 497, 504 (1978).

Congress may express its intent to preempt state law

explicitly in the language of the statute. Jones v. Rath Packing

Co., 430 U.S. 519, 525 (1977). Congress may express its intent

implicitly by passing an extensive statutory scheme that

extensively covers the field of regulation. Fidelity Federal

Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982).

Implied preemption also occurs when a conflict between state and

federal law makes compliance with both impossible, or when state

law would frustrate the purpose and objectives of the federal

law. Id. (citing Florida Lime & Avocado Growers, Inc. v. Paul,

373 U.S. 132, 142-43 (1963); Hines v. Davidowitz, 312 U.S. 52, 67

(1941)).

We are aided in our determination of preemption in this

case by the Supreme Court's recent treatment of the subject in

Cipollone v. Liggett Group, Inc., 112 S. Ct. 2608 (1992). In

Cipollone, a victim of lung cancer sued several cigarette

manufacturers for breach of warranties contained in cigarette

advertisements, for failure to warn of health hazards related to

-6-

smoking, for fraudulently misrepresenting those hazards to the

public, and for conspiracy to deprive the public of important

health information. Id. at 2613. The cigarette manufacturers

contended that petitioner's claims were preempted by the federal

law requiring a health warning to appear on all cigarette

advertisements and containers.2 Id. at 2614.

In analyzing preemption, the Court relied only on the

specific language of the provision regarding preemption. The

Court reasoned that "Congress' enactment of a provision defining

the preemptive reach of a statute implies that matters beyond

that reach are not preempted." Id. at 2618. The opinion thus

analyzed each of petitioner's claims in light of the express

language of the preemption provision in the cigarette warning

statute.

The plurality held that the provision preempted failure

to warn claims as to advertising practices, but not as to testing

or research practices. Id. at 2621-22. The plurality reasoned

that the Act only preempted state law claims arising out of

cigarette advertising and promotion, and that appellant's claims

arising out of testing and research did not relate to advertising

and promotion. The provision preempted petitioner's fraudulent

misrepresentation claim that cigarette advertising neutralized

2 That law stated that "[n]o requirement or prohibition based on
smoking or health shall be imposed under State law with respect
to the advertising or promotion of any cigarettes the packages of
which are labeled in conformity with the provisions of this Act."
Federal Cigarette Labeling and Advertising Act of 1965, 5, as
amended by Public Health Cigarette Smoking Act of 1969, 2, 15
U.S.C. 1334.

-7-

the effect of the warning in a similar fashion. Id. at 2623-24.

The provision, however, did not preempt fraud claims arising out

of communication other than advertising, such as information

required to be disclosed to an administrative agency, or out of

fraudulent statements made in the advertising but unrelated to

the health warning. Id.

The plurality further held that the provision did not

preempt express warranty claims, because those claims arose due

to the conduct of the manufacturers who made the warranties

rather than from state law. Id. at 2622. Finally, the plurality

held that the provision did not preempt the conspiracy to deprive

the public of material facts claims, because they did not arise

out of state law pertaining to smoking and health, but rather

arose out of a "duty not to conspire to commit fraud." Id. at

2624.

The analysis of the plurality in Cipollone guides our

analysis in this case. We begin by noting that the express

preemption provision in the MDA, 21 U.S.C. 360k, forecloses

inquiry into implied preemption, because the fact that Congress

included it in the MDA implies that matters beyond its reach are

not preempted. Further, we note that the Cipollone plurality

carefully construed the preemption provision to extend no further

than its language warranted. In doing so, the plurality sought

to pay proper respect to federal-state relations. This concern

arises out of "the assumption that the historic police powers of

the states [are] not to be superseded by . . . Federal Act unless

-8-

that [is] the clear and manifest purpose of Congress."

Cipollone, 112 S. Ct. at 2617 (citing Rice, 331 U.S. at 230). We

too will carefully construe the preemption provision of the MDA

to give due regard to questions of federal-state relations.

II.

Bearing these principles in mind, we turn to the

language of the statute in question. The MDA states that

(a) Except as provided in subsection (b)
of this section, no State or political
subdivision of a State may establish or
continue in effect with respect to a
device intended for human use any
requirement--

(1) which is different from, or in
addition to, any requirement applicable
under this chapter to the device, and

(2) which relates to the safety or
effectiveness of the device or to any
other matter included in a requirement
applicable to the device under this
chapter.

21 U.S.C. 360k. Under subsection (b) of 360k, a state may

petition the FDA in certain circumstances to allow state

requirements to continue in force. Because no such petition

affects this case, we are concerned only with the preemptive

effect of subsection (a). Under subsection (a), we must

determine whether appellant's products liability claims give rise

to state law requirements in addition to or different from those

mandated by the FDA.

We turn first to the FDA's own understanding of

subsection (a) for guidance. See Chevron U.S.A., Inc. v. Natural

Resources Defense Council, Inc., 467 U.S. 837 (1984) (agency's

-9-

interpretation of its own statute is controlling so long as not

contrary to Congress' intent). FDA regulations provide that

preemption does not apply when the FDA has issued no regulations

or other requirements specific to the particular device. 21

C.F.R. 808.1(d). In this case, it is clear that the FDA has

imposed requirements on Zyderm related to labeling, design,

manufacturing and other aspects of the device pursuant to the MDA

scheme.

If the FDA has issued requirements for a device,

subsection (a) prohibits states from imposing any requirements

which differ from or add to the FDA requirements, or which relate

to the safety or effectiveness of the device. A "State . . .

requirement" in subsection (a) may emanate from any requirement

established by a state including statutes, regulations, court

decisions or ordinances. 21 C.F.R. 808.1(b); see also San

Diego Building Trades Council v. Garmon, 359 U.S. 236, 247 (1959)

("[State] regulation can be as effectively exerted through an

award of damages as through some form of preventive relief. The

obligation to pay compensation can be, indeed is designed to be,

a potent method of governing conduct and controlling policy.").

The language of subsection (a) and the definition of

state requirement promulgated under it demonstrate a field of

preemption which is broad, but limited. Any state requirement

which, in effect, establishes a new substantive requirement for

the device in a regulated area such as labeling, is preempted.

21 C.F.R. 808.1(d)(6)(ii). As the Seventh Circuit noted,

-10-

however, subsection (a) of the MDA does not preempt such claims

as negligent implantation or removal of devices, or claims

arising out of contaminated devices. Slater v. Optical Radiation

Corp., 961 F.2d 1330, 1334 (7th Cir. 1992), cert. denied, 1992

U.S. LEXIS 6436 (Oct. 13, 1992).

Armed with this understanding of subsection (a), we

will analyze petitioner's claims individually to determine the

effect of the MDA preemption provision on each.

A. Strict Liability

Appellant contends that Zyderm is unsafe for its

intended purpose and unreasonably dangerous to users, and that

Collagen therefore is liable for any injuries Zyderm may cause.

Indeed, class III devices such as Zyderm are those that present a

"potential unreasonable risk of illness or injury" such that

extensive regulation is required to ensure reasonably safe use.

21 U.S.C. 360c(a)(1)(C). The FDA must evaluate these devices

with regard to those for whose use the device is intended. Id.

360c(a)(2)(A). The entire MDA scheme for such Class III

devices as Zyderm, therefore, is aimed at determining and

regulating the intended purpose of the device, and at ensuring a

reasonable level of safety for its users.

It is clear that appellant's strict liability claim

would impose requirements related to the safety and effectiveness

of Zyderm. If successful, the claim would require Collagen to

redesign Zyderm, remove it from the market, or be subject to

strict liability. The MDA does not permit this. Appellant's

-11-

claim would force us to determine that Zyderm is unsafe and

dangerous, in opposition to the contrary determination made by

the FDA under the MDA. Subsection (a) protects manufacturers of

medical devices approved by the FDA under the MDA from such state

law intrusion.

B. Breach of Warranty

Appellant claims that Collagen breached express and

implied warranties of merchantability and fitness for a

particular purpose. Appellant's express warranty claims arise

out of the labeling and packaging of Zyderm, all of which are

regulated by the FDA. In labeling and packaging, Collagen could

not say any less than what the FDA required, and appellee could

only add extra warnings or safety information, but not

warranties, without FDA approval. Appellant's express warranty

claims therefore are preempted because any such warranties only

could arise out of the FDA-approved labeling and packaging.

Allowing appellant's express warranty claims effectively would

impose additional or different requirements on Zyderm's labeling

and packaging.

We note that the Court's holding in Cipollone would

seem to require the opposite result in this case. However, the

warnings at issue in Cipollone were different than those here.

In Cipollone, the statute required cigarette manufacturers to

include a brief health warning in their advertisements; this

warning did not affect cigarette advertisements in any other way.

The manufacturers were free to make any claims they wished,

-12-

including express warranties. Here, however, the MDA has imposed

much more extensive regulation upon class III device

manufacturers. The FDA retains rigid control over the entirety

of the labeling and packaging of class III products, largely

displacing the ability of manufacturers to make additional

claims. This high level of control contrasts with the low level

of control in Cipollone, and ensures that manufacturers will not

be held liable for packaging and labeling imposed by the FDA.

Appellant also alleges that Collagen breached an

implied warranty of merchantability, and that this breach caused

her injuries. As an implied warranty is a requirement upon a

product that arises exclusively from the operation of state

contract law, this claim is preempted expressly by the MDA.

Otherwise, it would impose a requirement additional to those

imposed under the MDA.

C. Negligence

Appellant's third claim alleges negligence in the

design, manufacture, marketing and sale of Zyderm. This claim

also is preempted by the MDA. If the MDA does nothing else, it

regulates the design, manufacture, sale and marketing of class

III medical devices in an extensive way. The MDA does this

through the packaging and labeling requirements which directly

affect the marketing and sale of the product. The same

requirements also affect the design and manufacture of the

product in that these processes must be approved by the FDA and

described in the product's packaging and labeling.

-13-

As the design, manufacture, marketing and sale of

Zyderm is the subject of FDA regulation, the negligence claim is

preempted. Otherwise, a finding of negligence would force

Collagen to alter these aspects of Zyderm in response to the

finding of liability, or be subject to liability. Either result

impermissibly would impose an additional or different state

requirement upon the design, manufacture, marketing and sale of

Zyderm.

D. Product Misbranding, Misrepresentation & Failure to

Warn

Appellant contends that Zyderm was misbranded or

mislabeled. Misbranding generally occurs when labeling is "false

or misleading" in any particular. 31 U.S.C. 352(a). Under the

MDA, the FDA must reject proposed labeling when the labeling is

"false or misleading in any particular." Id. 360e(d)(2)(D).

As there is no indication in the record that the Zyderm

administered to Ms. King was anything but what the FDA-approved

labeling said it would be, notwithstanding appellant's bald

statements, we find this claim preempted.

Appellant's fifth and sixth claims of misrepresentation

and failure to warn are preempted for similar reasons. A finding

that Collagen misrepresented Zyderm to appellant would impose a

requirement on Collagen to change its packaging or labeling in

order to correct the misrepresentation. The failure to warn

claims similarly challenge the adequacy of Zyderm's FDA-regulated

packaging and labeling. The MDA forecloses these claims because

Collagen cannot be forced to change Zyderm's packaging and

-14-

labeling by virtue of these state law damage claims.

E. Fraud

Appellant's final cause of action alleges that Collagen

fraudulently obtained FDA approval at the premarketing stage of

the MDA process, and asks for treble damages due to the fraud.

This cause of action is more unclear than her other causes of

action. Collagen insists that the claim originally was based

upon Mass. Gen. L. ch. 231, 85J, an antifraud statute, while

appellant urges that it was based on a more general duty not to

deceive.

Section 85J provides that "[w]hoever, by deceit or

fraud, sells personal property shall be liable in tort to a

purchaser in treble the amount of damages sustained by him." The

language of this statute corresponds to Ms. King's fraud claim in

providing for treble damages. Because Ms. King has not specified

any applicable statute, or other reason why she is entitled to

treble damages under a general duty not to deceive, we must

conclude that the fraud claim originally arose under 85J. The

district court made the same finding in its memorandum and order

in this case.

To state a claim for fraud under 85J, the plaintiff

must be in privity with the seller. Kourouvacilis v. General

Motors Corp., 410 Mass. 706, 575 N.E.2d 734, 735 (1991). In this

case, no privity existed between appellant and Collagen, as

Collagen only sold its product directly to appellant's physician.

Thus, as a matter of Massachusetts law, appellant's fraud claim

-15-

must fail.

We further note that the fraud claim is, at bottom, a

failure to warn claim. It seeks to show that Collagen had a duty

to provide different information in Zyderm's packaging and

labeling than that which was approved by the FDA. As such, the

claim is preempted expressly by the MDA.

CONCLUSION

Because we have determined that the MDA expressly

preempts Ms. King's state law tort claims, the judgment of the

district court is affirmed.

"Concurrence follows"

-15-

ALDRICH, Senior Circuit Judge, with whom CAMPBELL,

Senior Circuit Judge, joins, concurring. While we agree with

our brother Torruella's result, and a good deal that he says,

we approach this case somewhat differently. First, a matter

of housekeeping. On December 13, 1991, a year past the

scheduled date for completion of the pleadings, plaintiff

filed a motion to allow an amended complaint, accompanied by

the complaint. On December 17 she wrote defendant that she

would withdraw her motion. Defendant, accordingly, did not

oppose. On December 27 defendant moved for summary judgment.

In opposing defendant's motion for judgment plaintiff made no

mention of the proposed new complaint, but, in fact, she did

not withdraw her motion, and the court later allowed it.

However, the court's ultimate order granting summary judgment

did not mention the amendment.

At first blush we might agree with defendant's

objection that there were substantive additions in the

amended complaint, particularly with relation to fraud.

Apart from fraud, the rest of the amended complaint contains

six claims as against, originally, two -- negligence and

breach of implied warranty. There was definitely a purported

enlargement -- a state tort of strict liability, and a claim

of express warranty. While the negligence alleged is limited

to designing and producing a dangerous product, and not that

the sample sold plaintiff was in some way a departure and

-16-

individually defective, plaintiff adds mislabeling and

misrepresentation, and, finally, failure to warn.

Taking defendant's now alleged seven sins, we group

them as follows. Strict liability (negligent design),

implied warranty, negligence, mislabeling, and failure to

warn are really all of a piece -- failure to warn. On the

record it is clear that had there been a warning that the

product might cause the disease that plaintiff allegedly

suffered she would have no claim under any of these headings.

On this basis there is thus no real enlargement by the

amended complaint. Express warranty might be enlargement,

but there is no basis for claiming it.3 Finally, fraud and

misrepresentation are not as newly put as they look.

Defendant would have it that the original allegation related

only to representations made to the plaintiff. Plaintiff

states that she intended her language to include

misrepresentations to the agency. Two of her exhibits

seeking to raise an issue on the motion for summary judgment

bear this out. The amendment should stand, as mere

clarification. However, we read fraud more broadly than does

our brother, and shall return to it later.

All agree that there is one basic issue: federal

preemption. Preemption may apply against state judicial as

3. Express warranty might have created a problem for the
defense of preemption, cf. Cipollone v. Liggett Group, Inc.,

112 S. Ct. 2608, 2622-23 (1992).

-17-

well as legislative action,4 Cipollone v. Liggett Group,

Inc., 112 S. Ct. 2608 (1992), and may take two forms, express

and implied, with a heavy burden upon the party asserting it.

Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977). This is

especially so when the subject is the state interest in

health and safety. Hillsborough County v. Automated Medical

Labs, Inc., 471 U.S. 707, 715, 718-19 (1985). The question

is Congressional intent. Wood v. General Motors Corp., 865

F.2d 395, 401 (1st Cir. 1988), cert. denied, 494 U.S. 1065

(1990). Here, concededly, the statute's purpose is health

protection, but the parties disagree as to its scope.

Plaintiff says it is directed to the individual user by

keeping harmful products off the market and assuring proper

warnings. Defendant says it is also to benefit the public at

large by shielding regulated manufacturers against

inconsistent state regulation, including lawsuits. If their

legal risks may be too great, worthwhile medical devices may

be left in the laboratory, to the public's loss.

Public health is a valid federal purpose, and

Congress can reasonably weigh possible loss to the

idiosyncratic few against benefits to the public generally.

See, e.g., Mary Beth Neraas, The National Childhood Vaccine

Injury Act of 1986: A Solution to the Vaccine Liability

4. A matter that may have troubled the court in Wood v.

General Motors, post. See, also, 21 C.F.R. 808.1(b).

-18-

Crisis? 63 Wash. L. Rev. 149 (1988). The legislative

history shows that this was precisely the Congressional

intent. Concededly, the U.S. Code Congressional and

Administrative News, 94th Congress, Second Session, Vol. 3,

pp. 1070 et seq., Medical Device Amendments of 1976, shows

the principal emphasis to be on the protection of the

individual user. But it also shows the intent to "encourage

. . . research and development" and "permit new and improved

devices to be marketed without delay." Infra. Perfection is

impossible and a few individuals may be denied full

protection at the cost of benefitting the rest.

Contained within the Senate Report (94-33)5 are

the following.

As medicine progresses, as research
makes new breakthroughs, an increasing
number of sophisticated, critically
important medical devices are being
developed and used in the United States.
These devices hold the promise of
improving the health and longevity of the
American people. The Committee wants to
encourage their research and development.
[1071]

S. 2368 recognizes the benefits that
medical research and experimentation to
develop devices offers to mankind. It
recognizes, too, the need for regulation
to assure that the public is protected
and that health professionals can have
more confidence in the performance of
devices. [1075]

5. The Senate bill was passed in lieu of the House bill.

-19-

The Committee recognizes the rapidly
changing nature of the devices field and
therefore feels that provisions must be
made to amend standards on the basis of
improved technology or new scientific
evidence. Such amendments should be made
in an expedited fashion so that
appropriate changes can be rapidly
implemented. The purpose of this
authority is to permit new or improved
devices to be marketed without delay so
that the public may have such beneficial
devices available to them as soon as
possible. [1083]

Translating this into a simple concept, and taking

the difference of opinion between the parties to be whether

the FDA requirements are merely minimum, or are the total

maximum protection afforded the individual user, we believe

this a clear demonstration of Congressional choice of the

latter. We further find that the comprehensive statutory

language conforms thereto.

21 U.S.C. 360e(c)(1) provides,

(1) Any person may file with the
Secretary an application for premarket
approval for a class III device. Such an
application for a device shall contain --

(A) full reports of all
information, published or known to
or which should reasonably be known
to the applicant, concerning
investigations which have been made
to show whether or not such device
is safe and effective;

(B) a full statement of the
components, ingredients, and
properties and of the principle or
principles of operation, of such
device;

-20-

(C) a full description of the
methods used in, and the facilities
and controls used for, the
manufacture, processing, and, when
relevant, packing and installation
of, such device;

(D) an identifying reference
to any performance standard under
section 360d of this title which
would be applicable to any aspect of
such device if it were a class II
device, and either adequate
information to show that such aspect
of such device fully meets such
performance standard or adequate
information to justify any deviation
from such standard;

(E) such samples of such
device and of components thereof as
the Secretary may reasonably
require, except that where the
submission of such samples is
impracticable or unduly burdensome,
the requirement of this subparagraph
may be met by the submission of
complete information concerning the
location of one or more such devices
readily available for examination
and testing;

(F) specimens of the labeling
proposed to be used for such device;
and

(G) such other information
relevant to the subject matter of
the application as the Secretary,
with the concurrence of the
appropriate panel under section 360c
of this title, may require.

Following these detailed requirements, and we note

especially subsection (F), comes Section 360k(a).

[N]o State or political subdivision of a
State may establish or continue in effect

-21-

with respect to a device intended for
human use any requirement --

(1) which is different from,
or in addition to, any
requirement applicable under
this chapter to the device, and

(2) which relates to the
safety or effectiveness of the
device or to any other matter
included in a requirement
applicable to the device under
this chapter.

Particularly in the light of the legislative history we read

this as maximum protection and express preemption, leaving no

need to seek implications. As all but one of plaintiff's

sustainable claims are premised on a failure to warn,

preemption here is unavoidable, given the subsection (F)

requirement that labels be reviewed by the FDA.

It follows that most of plaintiff's arguments are

beside the mark. A few, however, may deserve mention.

Plaintiff claims that because of the regulation reported in

21 C.F.R. 814.39(d)(1), to the effect that a manufacturer

"may," without prior approval, make certain changes that

enhance safety, defendant had a duty to make such here. It

is sufficient to say that to interpret "may" as "should"

would unravel the entire garment. Second, citing Silkwood v.

Kerr-McGee Corp., 464 U.S. 238, 251 (1984), plaintiff says

that, if defendant is correct, she has no cause of action.

Given an ambiguity, this objection is a factor in statutory

construction, but, of itself, it cannot create an ambiguity,

-22-

or there could never be preemption. Finally, plaintiff says

that the FDA's preemption regulation, 21 CFR 808.1(d)

conflicts with our result. When a statute is clear the

agency interpretation must give way. Hillsborough County,

471 U.S. at 714-15.

A more troublesome issue is the claim labeled

fraud.

FRAUD

. . . Defendant Collagen Corporation
fraudulently obtained FDA approval of the
Zyderm PMA, product and labeling, which
was a producing or proximate cause of
damage and injury to Plaintiff.
Defendant . . . further acted to suppress
the facts, blame injuries or other causes
that its product (sic) and prevent
disclosure of the true risks.[6]

Plaintiff has a case in point. In Hurley v.

Lederle Laboratories Division of American Cyanamid Co., 863

F.2d 1173 (5th Cir. 1988), the court, though agreeing with

the district court that the FDA regulation with respect to

defendant's vaccine labeling was intended to be preemptive,

remanded. At issue was the same tension between protecting

idiosyncratic individuals and the public health. Balancing

these, the Court concluded,

6. As in the original complaint, plaintiff sought treble
damages. Though not mentioned, presumably this demand
invoked Mass. G.L. c. 231, 85J, that awards treble damages
in certain cases of "deceit or fraud." We do not read it,
however, as limiting the scope of plaintiff's claims.

-23-

[T]his issue should be presented to the
jury in the form of special
interrogatories, questioning whether and
what information the manufacturer
withheld from the FDA, if any, and
whether possession of this information
would have materially altered the content
of the FDA's warning. This special
procedure is justified by the federal
interest in encouraging manufacturers to
produce vaccines, in that those
manufacturers need some assurance that if
they follow certain prescribed
procedures, such as including an FDA-
approved warning, they are complying with
the law.

Id. at 1180. With respect, one may wonder how "encouraging"

manufacturers would view the ruling.7 Rather, we side with

the later case of Papas v. Upjohn Co., 926 F.2d 1019 (11th

Cir. 1991), where the court said, at 1026 n.8,

To the extent that Hurley purports to

recognize an exception to federal
preemption of common law tort labeling
claims when the federal statute involved
explicitly prohibits state regulation of
labeling and the federal agency has
received incomplete information from the
manufacturer, we reject its holding at
least as applied to FIFRA-regulated
pesticides. Given the FIFRA regulatory
scheme, it would be up to the EPA -- and
not a jury -- to determine first (1)

whether the information provided was
incomplete or inaccurate; (2) whether the
omitted information is significant enough
to mandate a change in the label; and (3)
how, if at all, the label should be
corrected.

7. Indeed, we are reminded of the observation that the
British hanged a negligent admiral "pour encourager les
autres." Voltaire, Candide, Ch. 23.

-24-

To prove fraud, plaintiff must show causality. Surely, where

the FDA was authorized to render the expert decision on

Collagen's use and labeling, it, and not some jury or judge,

is best suited to determine the factual issues and what their

effect would have been on its original conclusions. Further,

if the court erred, and incorrectly posited the effect on the

FDA's use and labeling decision, this would impose a state

requirement "which is different from, or in addition to, any

requirement applicable . . . to the device." 21 U.S.C.

360k(a). In addition to running afoul of the general

principle against implying personal causes of action, Royal

Bus Group, Inc. v. Realist, Inc., 933 F.2d 1056 (1st Cir.

1991), plaintiff would be breaching the federal dyke in the

absence of its keeper.

Papas has been vacated and remanded for further

consideration in the light of Cipollone, 112 S. Ct. 2608, but

we do not believe this to be a reversal on that point. Our

position is consistent with Cipollone, that did not preempt

fraud found to be outside the communication targeted by the

regulation.8 112 S. Ct. at 2623-24.

8. Plaintiff similarly presents a claim for
misrepresentation, both to the public and to plaintiff's
physician. As the record shows no statements to the public
or physicians that go beyond those approved by the FDA, this
claim collapses into that of fraud on the FDA.

-25-