Kim **NETLAND**, Plaintiff,

v.

**HESS & CLARK, INC.,** Defendant.

**No. CIV.99–1032 ADM/RLE.**

United States District Court, D. Minnesota.

April 16, 2001.

Robert Feigh, Hall & Byers, P.A., St. Cloud, MN, for Plaintiff.

Ann Marie Hanrahan, Dara D. Mann, Peter John Goss, Faegre & Benson LLP, Minneapolis, MN, Gary W. Callahan, Greeley, CO, Elizabeth R. Jones, Michael L. Beatty & Assoc., Denver, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

MONTGOMERY, District Judge.

### I. INTRODUCTION

On February 1, 2001, the undersigned United States District Judge heard Defendant Hess & Clark's Motion for Summary Judgment [Doc. No. 31]. Defendant seeks summary judgment on Plaintiff Kim Netland's claims for: (1) "strict liability"; (2) "failure to warn"; and (3) "negligence and breach of warranty." Compl. ¶¶ 12, 15, 18. Defendant argues that the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.*, preempts all common law actions against manufacturers of EPA-registered pesticides that are based upon claims directly or indirectly relating to labeling, including any failure to warn theory. For the reasons set forth below, Defendant's motion is granted.

### II. BACKGROUND [1]

Plaintiff Kim Netland ("Netland") alleges that he developed aplastic anemia after using Defendant Hess & Clark's ("Defendant") insecticide product, KenAg Bovinol ("Bovinol"),[2] to spray his horses. Defendant's Statement of Material Undisputed

---

1. In passing on a motion for summary judgment, the court must review the facts in the light most favorable to the party opposing the motion, and must give that party the benefit of all reasonable inferences to be drawn from the evidence. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

2. Bovinol's active ingredient is Dichlorvos, also known as DDVP or Vapona. SMF ¶ 4.

Facts ("SMF") ¶¶ 12–18, 24–26. Bovinol is an organophosphate insecticide, registered with the United States Environmental Protection Agency ("EPA"). SMF ¶¶ 5–11. The product label describes all of its approved uses, none of which include use on horses. SMF ¶¶ 19–21. Under FIFRA, it is a violation of federal law to use a pesticide product in a manner inconsistent with its labeling. *See* 7 U.S.C. § 136(ee). The Bovinol label lists various warnings and precautions, including instructions to use specific personal protective gear when spraying Bovinol. SMF ¶ 22. Part of the label reads:

### Hazardous to Humans and Domestic Animals Warning

May be fatal if swallowed, inhaled or absorbed through the skin or eyes. Rapidly absorbed through skin and eyes. Do not get into eyes, on skin or on clothing. Do not breathe vapor or spray mist. Wash thoroughly with soap and water after handling and before eating or smoking. Do not contaminate feed, water, foodstuffs, milk or milking utensils.

Wear clean natural rubber gloves, protective clothing, and goggles, faceshield or equivalent. Wear a pesticide respirator jointly approved by the Mining Enforcement and Safety Administration (MESA) and the National Institute for Occupational Safety and Health (NIOSH) under the provisions of 30 C.F.R. Part 11. Wear impervious footwear or protective covers as shoes, boots and other articles made of leather or similar porous materials may be dangerously contaminated.

Bovinol Label, SMF ¶ 22.

In June 1994, Margaret Netland, Netland's mother, purchased Bovinol from a Bagley, Minnesota retailer, Marty Broth-

ers. SMF ¶ 12. Margaret Netland purchased Bovinol for her son's use in keeping flies away from his horses. SMF ¶¶ 12–13. She was concerned about the risk of injury to Netland if the horses reacted unpredictably to the flies. M. Netland Dep., at 71. After reading the label, Margaret Netland, using plastic gloves for protection, poured the Bovinol into a "Lysol Basin, Tub & Tile" cleaner spray bottle. SMF ¶¶ 15–17. She kept the spray bottle next to the large container of Bovinol in the barn and told Netland to use the spray in the bottle. *Id.* Margaret Netland refilled the spray bottle at least once, if not twice. M. Netland Dep., at 73. Netland admits he did not read the Bovinol label. SMF ¶ 23.

Netland alleges that he used Bovinol approximately three to four times per week for a period of approximately six weeks in the summer of 1994. SMF ¶ 24. During each use, Netland testified that he sprayed one or two horses, with eight to ten squirts from the spray bottle for each horse. *Id.* Netland rode the horses within minutes after spraying them. Netland believes Bovinol contacted his skin as a result of his touching the horses and the fact that his clothing was damp with Bovinol after riding the horses. *See* K. Netland Dep., at 87–92, 94.

In late August and September of 1994, Netland began feeling more fatigued each week. *Id.* at 123–24. On September 28, 1994, Netland collapsed and was taken to his family physician, Dr. Thabes, who referred him to a hematologist, Dr. Kobrinsky. *See* Thabes Dep., at 18, 28, 41. Netland was diagnosed with acquired aplastic anemia.[3] SMF ¶ 25.

Netland's Complaint alleges theories of "strict liability," "failure to warn," and "negligence and breach of implied warranty." Compl. ¶¶ 12, 15, 18. Netland's liabili-

---

**3.** Aplastic anemia is an anemia characterized by defective function of the bone marrow, such that there is a failure to properly form all types of blood cells.

ty expert is Dr. Richard L. Lipsey. SMF ¶ 37. Dr. Lipsey opined "the only possible cause of [Netland's] aplastic anemia has to be the [Bovinol] product. Because he had a strong spatial correlation [sic]. He was there, he used it, he had no protective equipment." SMF ¶ 45. Dr. Lipsey testified that the Bovinol's label was insufficient and that a prudent manufacturer should have warned users to "avoid breathing the vapors," and "avoid getting it on your skin." SMF ¶ 57. Dr. Lipsey further testified that Bovinol is safe as long as it is used properly and is distributed with appropriate warnings so that the user avoids breathing the spray mist. SMF ¶¶ 56–61.

## III. DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A genuine issue of material fact does not exist "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The movant has the burden of showing that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the movant meets its Rule 56(c) burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evi-

dence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When weighing the evidence offered by the parties on a motion for summary judgment, this Court must review the evidence and all inferences drawn from that evidence in the light most favorable to the party opposing the motion. *See Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The nonmovant, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348.

### B. Preemption

 Preemption is based on the Supremacy Clause of Article VI of the United States Constitution. U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any thing in the Constitution or Laws of any State to the contrary notwithstanding."). The Supremacy Clause invalidates state laws that interfere with or are contrary to federal law. *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 604, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991); *Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707, 712, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). Such state laws may include legislative enactments and executive pronouncements, i.e. positive law, as well as common law claims recognized by state courts. *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 521–22, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).[4]

---

4. The plurality's judgment in *Cipollone* has been embraced fully by the Supreme Court. *See CSX Transp., Inc. v. Easterwood*, 507 U.S.

658, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993); *Freightliner Corp. v. Myrick*, 514 U.S.

Given Congress' power to preempt state laws with federal regulation, the question is whether Congress intended such federal regulation to supercede state laws. "Congress' intent may be explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Cipollone,* 505 U.S. at 516, 112 S.Ct. 2608. In the case at hand, FIFRA contains an express preemption clause. *See* 7 U.S.C. § 136v(b).

██ FIFRA creates a comprehensive scheme for the regulation of the sale, labeling, packaging, and use of pesticides. *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 991–92, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984); *Welchert v. American Cyanamid, Inc.,* 59 F.3d 69, 71 (8th Cir.1995). FIFRA requires that all pesticides to be sold and distributed in the United States must be registered with the EPA. *See* 7 U.S.C. § 136a(a). FIFRA establishes a complex process of EPA review that results in the approval of a pesticide label under which the product may be marketed. *Welchert,* 59 F.3d at 71. Manufacturers must propose draft label language addressing a various number of topics, including ingredients, directions for use, and adverse effects. *Id.;* 7 U.S.C. § 136a(c). The EPA's rules and regulations set forth specific labeling requirements. *See* 40 C.F.R. § 156.10. The final label must be approved by the EPA prior to registration. *See* 40 C.F.R. § 156.10(a)(6).

██ Under FIFRA, the EPA may not register a pesticide or approve its labeling unless, *inter alia,* it finds that the product "will perform its intended function without unreasonable adverse effects on the environment [and] when used in accordance with widespread and commonly recognized practice, it will not generally cause unreasonable adverse effects on the environ-

ment." 7 U.S.C. § 136a(c)(5). As defined in FIFRA, the term "environment" includes "water, air, land, and all plants *and man* and other animals living therein." 7 U.S.C. § 136(j) (emphasis added). Thus, the EPA must conclude that the product and its labeling are satisfactory to protect human safety when the product is used in accordance with the approved directions for use on the label.

██ Once a label is approved, FIFRA expressly provides for a defense, based upon preemption, against certain state law claims. *National Bank of Commerce v. Dow Chemical Co.,* 165 F.3d 602, 608 (8th Cir.1999). The preemptive provision of FIFRA states:

§ 136v. Authority of States

(a) In general

A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

(b) Uniformity

Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

7 U.S.C. § 136v.

Thus, FIFRA expressly preempts state imposed requirements in the areas of labeling and packaging that are "in addition to or different from those required" by the EPA. 7 U.S.C. § 136v(b). The term "requirements" in § 136v includes not only state statutory law but also state common-law damages claims. *See Medtronic,* 518 U.S. at 487–88, 116 S.Ct. 2240; *Cipollone,* 505 U.S. at 521, 112 S.Ct. 2608 (concluding

280, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) (acknowledging the possibility that tort claims may be impliedly preempted even if not ex-

pressly preempted under an applicable statutory provision).

that the term "requirements" sweeps broadly and "easily encompass[es] obligations that take the form of common-law rules" and that an award of damages can be " 'a potent method of governing conduct and controlling policy' " (quoting *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 247, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959))). The legislative history confirms that Congress intended § 136v(b) to completely preempt state law with regard to labeling and packaging. *See* H.R. Rep. 92–511, 92d Cong., 1st Sess. 16 (1971). Indeed, it was Congress' intent that § 136v(b) preempt "any State labeling or packaging requirements differing from such requirements under the Act." S. Rep. 92–838, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.C.C.A.N. at 4021. At all times relevant to this case, the parties agree that the Bovinol product was properly registered with the EPA pursuant to FIFRA and carried the label approved by the EPA. SMF ¶ 11.

### 1. "Failure to warn" claim

■■■ Netland alleges a failure to warn claim. State common law claims for "inadequate labeling" or "failure to warn" are preempted by FIFRA. *National Bank of Commerce,* 165 F.3d at 608. "It is immaterial whether an inadequate labeling or failure to warn claim is brought under a negligence or products liability theory." *Id.* Such claims attempt to impose liability for the lack of warning labels "in addition to or different from those required" by the EPA. *See Welchert,* 59 F.3d at 73 ("Where Congress has so clearly put pesticide labeling regulation in the hands of the EPA, [a] claim challenging the accuracy of the [pesticide] label's federally-mandated and approved statement cannot survive. To hold otherwise would be to allow state courts to sit, in effect, as super-EPA review boards that could question the adequacy of the EPA's determination of whether a pesticide registrant successfully complied with

the specific labeling requirements of its own regulations. In such case, state court consideration of the label statement would be an 'additional' requirement.") (internal citations omitted). Netland's failure to warn claim is preempted by FIFRA.

### 2. "Negligence and breach of warranty" claim

■■■ Netland claims "negligence and breach of warranty," alleging that Defendant "failed to use reasonable care in the design, manufacture, and sale of the [Bovinol] product." Compl. ¶ 18. To the extent that this claim also is predicated on failure to warn and inadequate labeling, it too is preempted by FIFRA. *National Bank of Commerce,* 165 F.3d at 608. A claim of negligence for defective manufacture or design, which does not directly attack the EPA-approved labeling, may escape FIFRA's preemption. *Id.* at 609. However, merely alleging that a claim is a design or manufacturing defect claim does not automatically avoid FIFRA's express preemption clause. *See Grenier v. Vermont Log Bldgs., Inc.,* 96 F.3d 559, 564 (1st Cir. 1996). Netland's liability expert, Dr. Lipsey, testified that Bovinol is safe as long as it is used properly and is distributed with appropriate labeling. Netland has not produced any evidence of errors in the manufacture of Bovinol by Defendant other than the adequacy of the warning. *See National Bank of Commerce,* 165 F.3d at 609 (holding that plaintiff's defective manufacturing or design claims fail because they lack sufficient evidentiary support to avoid summary judgment). Netland's only elaborated theory under the negligence claim is that Bovinol was defectively designed or manufactured because it was foreseeable that it would be used on horses and it was unfit for this use. This semantically reworked claim is essentially nothing more than a repeat salvo on the label's failure to warn against use on horses be-

fore riding. *See Johnson v. Monsanto Chemical Co.*, 129 F.Supp.2d 189, 194–95 (N.D.N.Y.2001) ("Claims of misdesign or mismanufacture which the Court regards as thinly veiled labeling or failure to warn claims will not stand."). FIFRA preempts Netland's "negligence" claim. *See Grenier*, 96 F.3d at 564–65.

Netland's breach of an express warranty claim is necessarily based on the EPA-approved label. The Eighth Circuit has held that FIFRA preempts common law claims for breach of express warranty. *See Welchert*, 59 F.3d at 73. Similarly, FIFRA preempts Netland's breach of an implied warranty claim. *National Bank of Commerce*, 165 F.3d at 608. To allow Netland's warranty claims would result in additional or different requirements for the Bovinol label or package. *Id.* Summary judgment is thus appropriate for Netland's warranty claims.

### 3. "Strict liability" claim

 To establish a strict liability claim, Minnesota law requires a plaintiff to prove that: (1) the defendant's product was in a defective condition unreasonably dangerous for its intended use, (2) the defect existed when the product left the defendant's control, and (3) the defect was the proximate cause of the injury sustained. *Marcon v. Kmart Corp.*, 573 N.W.2d 728, 730 (Minn.App.1998) (citing *Bilotta v. Kelley Co.*, 346 N.W.2d 616, 623 n. 3 (Minn.1984)). In determining whether a product is defective, Minnesota courts apply a "reasonable care balancing test." *Drager by Gutzman v. Aluminum Industries Corp.*, 495 N.W.2d 879, 882 (Minn. App.1993). A manufacturer is obligated to exercise a degree of care in its design that avoids any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which it was intended or in a manner that was reasonably foreseeable. *Id.*

Netland cannot elude FIFRA's preemption provision simply by alleging a strict liability claim. *See Grenier*, 96 F.3d at 564. The evidence must be examined to determine whether Netland's strict liability claim is premised on something other than the label and whether the claim indirectly attempts to impose label requirements in addition to or different than those required by the EPA. *See id.; National Bank of Commerce*, 165 F.3d at 608–09. Netland argues that because the Bovinol label indicates an intended use for the control of insects in livestock barns, including horse barns, Netland's use of Bovinol on his horses before he rode them was intended or reasonably foreseeable. *See* Mem. In Oppos., at 9. However, Netland's liability expert testified that Bovinol is safe as long as it is used properly and is distributed with appropriate labeling. Moreover, as required by FIFRA, the EPA determined that Bovinol would perform its intended function without unreasonable adverse effects on humans and, when used in accordance with widespread and commonly recognized practice, it would not generally cause unreasonable adverse effects on humans. *See* 7 U.S.C. §§ 136a(c)(5), 136(j). Because Netland fails to present evidence showing that Bovinol was unreasonably dangerous, Netland cannot meet the first element of a strict liability claim. *See National Bank of Commerce*, 165 F.3d at 609 (finding plaintiff did not present evidence proving that the product was unreasonably dangerous and whether the defective condition proximately caused the harm).

Essentially, Netland's strict liability theory is that Bovinol was in a defective condition unreasonably dangerous for its intended use because it was foreseeable that it would be sprayed on horses before riding them and it was unfit for this use. This claim is simply another condemnation of the label's failure to warn against using

Bovinol on horses before riding them. *See Grenier*, 96 F.3d at 564–65. Netland's strict liability claim indirectly attempts to impose label requirements in addition to or different than those imposed by the EPA. FIFRA preempts such claims, regardless of the form in which they appear.

Because FIFRA preempts Netland's claims, the Court does not reach Defendant's arguments that Netland is unable prove causation.

### IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Hess & Clark's Motion for Summary Judgment [Doc. No. 31] is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**